**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Frank CHURCH, Carl Louis Coppola,
Defendants–Appellants.**

**No. 89–8509.**

United States Court of Appeals,
Eleventh Circuit.

March 11, 1992.

Rehearing Denied April 15, 1992.

**5.** *United States v. Clark,* 944 F.2d 803, 804 (11th Cir.1991).

Stephen A. Delaney, Marietta, Ga., for Church.

Fred Haddad, Fort Lauderdale, Fla., for Coppola.

James M. Deichert, U.S. Dept. of Justice, Organized Crime Strike Force, Atlanta, Ga., Louis M. Fischer, U.S. Dept. of Justice, Crim. Div., Appellate Section, Washington, D.C., for U.S.

Before KRAVITCH and BIRCH, Circuit Judges, and KAUFMAN*, Senior District Judge.

KRAVITCH, Circuit Judge:

Carl Louis Coppola ("Coppola") and Frank Church ("Church") were convicted by a Northern District of Georgia jury on RICO and RICO-conspiracy counts in violation of 18 U.S.C. §§ 1962(c) and 1962(d). Coppola was also convicted on three narcotics counts involving the purchase and distribution of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and on one count of engaging in a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848. The RICO charges concerned an enterprise that revolved around Coppola and a changing roster of associates and that engaged in a variety of criminal activity over a number of years. Coppola and Church filed motions for a new trial or acquittal, which the district court denied. The court sentenced Coppola to fifty-five years in prison: forty years for the CCE conviction, to be served consecutively with concurrent fifteen-year sentences for convictions of cocaine possession and the RICO violations. The court sentenced Church to fifteen years in prison on the RICO convictions.

Coppola and Church appeal their convictions, claiming, inter alia, insufficiency of the evidence and a material variance between the indictment and the proof at trial on the RICO counts. Coppola further challenges his convictions by arguing that certain evidence was improperly admitted.[1] Coppola also argues that if his CCE conviction stands, then his convictions on Counts Five and Seven, two conspiracy counts that constituted lesser included offenses of the CCE, should merge with the CCE conviction and be vacated.[2] The government concedes that Coppola cannot be convicted on both the CCE and these conspiracy counts. We vacate Coppola's conviction on Counts Five and Seven, but affirm in every other respect.

## BACKGROUND

On May 9, 1986, a Northern District of Georgia grand jury returned an eleven-

---

* Honorable Frank A. Kaufman, Senior U.S. District Judge for the District of Maryland, sitting by designation.

1. Appellants, either individually or together, raise other claims that are without merit and that do not warrant discussion. These include: abuse of discretion by the district court in failing to accept their proffered jury instructions; insufficiency of the evidence on Counts Six and Seven (one substantive and one conspiracy count involving cocaine trafficking); and prosecutorial misconduct in rebuttal summation. Coppola waives his search-and-seizure and forfeiture claims by failing to brief them here. *See* Fed.R.App.P. 28(a); *Baker v. Montgomery,* 811 F.2d 557, 558 (11th Cir.1987). Also, we do not reach the claim that the RICO statute is unconstitutionally vague because appellants failed to raise it in the district court. *See United States v.*

*Simpson,* 904 F.2d 607, 611 (11th Cir.1990). Moreover, this court has summarily rejected a claim that RICO is unconstitutionally vague, finding the claim "completely lacking in merit," *United States v. Van Dorn,* 925 F.2d 1331, 1334 n. 2 (11th Cir.1991), although no explanation of the analysis used to reach this conclusion was given.

2. The district court did not sentence Coppola for his convictions on these two counts, which involved conspiracy to possess cocaine with intent to distribute. Coppola's conviction on Count Six, possessing cocaine with intent to distribute, was also a CCE predicate but cannot be vacated because a substantive conviction does not merge with a CCE conviction. *See United States v. Jones,* 918 F.2d 909, 910–11 (11th Cir.1990).

count indictment against Coppola, Church, and eleven other co-defendants. The indictment included, *inter alia,* RICO and RICO conspiracy counts listing twenty-five predicate acts of racketeering and 121 overt acts in furtherance of the RICO conspiracy, and counts involving cocaine and marijuana importation and distribution and engaging in a CCE.[3]

During a trial that lasted more than three months and included the testimony of more than seventy witnesses, the government showed that from 1973 to 1986 Coppola headed a single, ongoing enterprise engaged, at various times, in importing and distributing marijuana; funneling the marijuana profits into legitimate businesses; concealing Coppola's ownership of the businesses; using violence—including conspiring to murder Coppola associates Daniel Forgione ("Forgione") and Thomas Papanier, also known as Thomas Papania ("Papanier")—to protect Coppola's interests; distributing cocaine; and conspiring to commit robbery. The government also introduced evidence of a conspiracy to murder Coppola associate Joey Cam ("Cam"). The Cam murder conspiracy was not listed in the indictment.

From 1973 to 1980 or 1981, Coppola and others imported and distributed large quantities of marijuana, reaping profits that reached into the millions of dollars. Coppola and Cam, who had been friends since high school, were partners in this scheme. Their associates included, but were not limited to, Alex Biscuiti ("Biscuiti"), Carlos DeBiase ("C. DeBiase"), Juan DeBiase ("J. DeBiase"), John Fischer ("Fischer"), William Wotocek ("Wotocek"), and Church, who was responsible for making various arrangements in Florida with respect to two loads of marijuana that the group imported into the country in 1978.

In 1977, Coppola moved to Atlanta, and he and Cam, who remained in Florida, began to funnel their marijuana profits into, and conceal the true ownership of, two businesses, an adult nightclub and a bar, both of which failed. In 1978, Coppola and Cam invested profits from marijuana trafficking into a restaurant. Coppola oversaw the construction and the operation of the restaurant, Jilly's the Place for Ribs ("Jilly's"), which eventually grew into a small chain through a franchising and licensing corporation headed by Coppola. Cam did not take an active interest in the restaurant, although he and Coppola remained partners. Coppola employed many of his marijuana-trafficking associates in Jilly's, including Fischer, Wotocek, and Biscuiti. Cam drew paychecks and received medical benefits. Coppola also continued actively to import marijuana. He also received an "override" of ten dollars a bale from associates who, using his contacts, engaged in smuggling on their own. Some time in 1980 or 1981, Coppola ceased an active involvement in marijuana smuggling.[4] In 1981, he invested proceeds from the first Jilly's in the second. A third Jilly's opened in 1982 and a fourth Jilly's opened in 1984.

In the early 1980s, Cam, who was still smuggling marijuana, ran into financial difficulty and began to demand money from the restaurant business. Coppola refused even to return Cam's investment, suggesting instead that Cam move to Atlanta and work in the restaurants for a salary.[5] Cam came to stay with Coppola in Atlanta, but apparently believed that Coppola was cheating him. In November, 1982, Cam and others kidnapped Coppola. They held him for three weeks, receiving $53,000 af-

---

**3.** Eight co-defendants, Alexander Biscuiti, Charles Brown, Sharon Conte, Carlos DeBiase, Benjamin Edelstein, Harold Rodovich, Arthur Randall Sanders, and William Wotocek, pled guilty. One co-defendant, Juan DeBiase, remained a fugitive at the time of this appeal. Two co-defendants, Darrell Brown and Thomas Papanier, stood trial with Coppola and Church and were acquitted.

**4.** The government contends that Coppola was participating in marijuana importation up until the summer of 1981, conspiring with Cam, Biscuiti, Wotocek, C. DeBiase, and J. DeBiase. The jury, however, acquitted Coppola of Count Four of the indictment, the substance of which was this conspiracy. Coppola contends that he stopped importing marijuana in 1980 and that the jury acquittal on Count Four indicates that the jury believed his version of events.

**5.** Cam was already drawing a $100–a–week paycheck and health benefits from the restaurant.

ter forcing Coppola to instruct a Jilly's employee to give them cash from the restaurant. Coppola was released after managing to contact the police, who arrested Cam. One confederate was also arrested, but the other, Frank Pilara ("Pilara"), remained at large.

In the aftermath of the kidnapping, fearing that Cam and Pilara remained a threat to him, his family, and his assets, Coppola did two things: First, he approached Forgione, a Miami-area union official with ties to organized crime, to assure his protection, and second, he recruited a bodyguard, Papanier, from New York. Coppola nevertheless posted bond and hired an attorney for Cam.

Forgione arranged a "sit down" to settle the dispute, in which Forgione, Papanier, Coppola, Biscuiti, and a person known only as "Tony," with alleged ties to a Chicago organized-crime family, participated. Although the true nature of this and subsequent sit downs is unclear, it appears that organized-crime figures in Chicago were representing Pilara and Cam's interests, and Papanier was apparently using his ties to New York organized crime to represent Coppola. As a result of these meetings, an agreement was imposed on Cam and Coppola. In exchange for Cam's promise to turn over his stock in Jilly's and tapes of conversations with Coppola that he had clandestinely recorded over the years, Coppola promised to pay Cam $250,000, in installments, for the stock and to testify favorably for Cam at his kidnapping trial. In addition, Cam was allowed to keep the ransom money.

Whether extortion—involving threats to Coppola's control of Jilly's—or a fee for services in settling the dispute, the Chicago group demanded $500,000 from Coppola and the New York group demanded $100,000 from him. Coppola was forced to deplete his assets and borrow several hundred thousand dollars from longtime associate Biscuiti to pay this sum.

Cam, still unsatisfied, refused to turn over the tapes, threatening to kidnap Coppola's ex-wife and daughter or release the information contained in the tapes. It was then that Coppola commissioned Forgione to kill Cam. Although this murder conspiracy was not included in the indictment, the government presented evidence that, in May, 1983, Forgione shot Cam to death.

Coppola and Forgione had disputes over payment for the murder. Forgione repeatedly pressed Coppola for payment and threatened to take the restaurants away from him. This led Coppola to fear Forgione as well and, in early 1984, conspire to have Forgione killed. Participants in this murder conspiracy included Coppola, Biscuiti, and Joseph Lee ("Lee"), a new bodyguard and associate. Lee had replaced Papanier, from whom Coppola had separated because of a falling out. In one episode from this conspiracy, Lee and Coppola built a bomb and gave it to Biscuiti to plant. Biscuiti never planted the bomb, eventually returning it to Coppola and Lee, who disposed of it. Although Forgione was later shot to death, it is not clear whether Coppola was behind the actual killing. The government also presented evidence of a conspiracy to murder Papanier, whom Coppola apparently had also grown to fear. This conspiracy included another abortive bombing attempt.

Meanwhile, in late 1983, Coppola decided that he would repay the several-hundred-thousand-dollar loan from Biscuiti and shore up his own assets by setting up an organization for the purchase and distribution of cocaine. This organization included Lee Harold Rodovich ("Rodovich"), another new associate, who became Coppola's bodyguard after Lee was injured in an accident. The only associate from the marijuana-smuggling operation involved in the cocaine scheme with Coppola at this time was Biscuiti, who testified that at Coppola's direction he and associate John Tribiano ("Tribiano"), attempted to establish a source for cocaine in New York in early 1984. Coppola apparently decided not to use this source, however.

Instead, Coppola set up an organization in which he provided the financing, Rodovich purchased the cocaine, and Lee transported it. In April, 1984, Rodovich acquired approximately a kilo of cocaine.

Lee and Coppola drove to the Kansas City, Missouri area in a car leased to Jilly's and Lee distributed a portion of the cocaine there through Sherry Caswell ("Caswell"), his common-law wife. Coppola and Lee purchased two more kilos from Rodovich in separate transactions in early May. Coppola sold some of this cocaine to street-level dealers Benjamin Edelstein ("Edelstein") and Arthur Sanders ("Sanders") in Atlanta. Lee again distributed a portion of the cocaine through Caswell in Kansas City.

When Coppola became dissatisfied with the quality of the cocaine that Rodovich was securing, he decided to cut Rodovich out of the business. For a new source for cocaine, he instructed Lee to contact Church, who had not been associated with the Coppola organization since 1978, although he had twice sold Coppola small amounts of cocaine, apparently for personal consumption, earlier in 1984. Church facilitated a sale of half a kilo to Lee in July and a full kilo in September and discussed "fronting" Lee cocaine in the future if Lee would purchase the drug in sufficiently large quantities. "Fronting" means providing the cocaine for no charge up front, waiting for the middleman to resell the cocaine before receiving payment. Again, Lee distributed a portion of the cocaine in Kansas City, this time through others as well as Caswell.

The government also presented evidence that in early 1984 Coppola conspired with Lee, Rodovich, and others in an unsuccessful attempt to rob a drug dealer in Long Beach, California in late February, 1984. Coppola, Church, and the other co-defendants were indicted in May, 1986.

## DISCUSSION

### I. Sufficiency of the Evidence

Church argues that the government's evidence was insufficient to prove (1) that his two predicate acts of selling cocaine had the continuity and relationship necessary to form a pattern of racketeering activity under 18 U.S.C. 1962,[6] and (2) that he agreed to participate in the RICO conspiracy.[7] Coppola argues that the government's evidence was insufficient (1) to support his conviction of cocaine conspiracy and (2) to prove all five elements of a CCE violation under 21 U.S.C. § 848.

When evaluating a sufficiency-of-the-evidence claim, we must view the evidence in the light most favorable to the government, drawing all reasonable inferences in favor of the jury's verdict. *See United States v. Gutierrez*, 931 F.2d 1482, 1488 (11th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991). The evidence is sufficient to support a conviction "if a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Graziano*, 710 F.2d 691, 697 (11th Cir.1983), *cert. denied*, 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984).

### A. Church

#### 1. *Pattern of Racketeering Activity*

A party seeking to show a "pattern of racketeering activity" under 18 U.S.C. § 1962, beyond proving at least two predicate acts, must establish that the predicate acts demonstrate both relationship and continuity. *See H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). Church argues that his two predicate acts of facilitating the sale of cocaine to Lee do not satisfy the continuity requirement spelled out in *H.J., Inc.*, in which the Supreme Court stated:

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.... A party alleging a RICO violation may demonstrate continuity over a

---

6. In its brief, the government relies only on these sales, choosing not to discuss Church's earlier involvement in the marijuana smuggling in 1978.

7. Church also argues that the government failed to prove a nexus between his predicate acts and the enterprise because the acts had not been tied to Coppola. This argument is without merit. There was ample evidence linking Coppola to the two cocaine sales.

closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases liability depends on whether the *threat* of continuity is demonstrated.... Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case.

*Id.* at 241, 109 S.Ct. at 2902.

The government presented evidence that (1) Church facilitated the sale of approximately half a kilo of cocaine to Lee in July, 1984 and the sale of approximately one kilo to Lee in September, 1984; (2) Lee informed Church between the first and second transactions that he planned to distribute the cocaine and then come back to buy more; and (3) Church offered to front Lee as much cocaine as he wanted in the future if Lee would be willing to handle larger amounts. Lee was arrested before any further transactions took place.

The *H.J., Inc.* Court offered examples of evidence that would demonstrate a threat of continuity, including a "showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Id.* at 242–43, 109 S.Ct. at 2902.

In *United States v. Link,* 921 F.2d 1523, 1527 (11th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 2273, 114 L.Ed.2d 724 (1991), this court, quoting a portion of the above language, held that a defendant's two purchases of drugs for redistribution from the same organization over an eight or nine month period demonstrated a threat of continued racketeering activity because the defendant operated as part of a long-term association that existed for criminal purposes.

Although Church's second connection with Coppola's enterprise was not long, spanning only three months, it is not the length of the defendant's connection with the "association," or enterprise, that poses the threat of continued racketeering activity. Rather, it is the association's long-term existence and regular way of doing business that poses the threat of continued racketeering activity.

Here, Coppola's enterprise, long experienced in the distribution of illegal drugs, already had purchased cocaine for distribution on at least three separate occasions before turning to Church as a preferred source. The enterprise then dealt with Church twice. If this conduct—the continuing acts of an enterprise seeking sources and markets for cocaine—is alone not sufficient to establish the threat of continued racketeering activity as "an ongoing entity's regular way of doing business," Lee's promise between the two transactions to return to Church to purchase more cocaine and Church's offer to front Lee as much cocaine as he wanted in the future established such a threat. A reasonable trier of fact could therefore find that this conduct demonstrated a threat of continued racketeering activity, thus constituting a pattern of racketeering activity.

### 2. *Agreement to Participate in RICO Conspiracy*

Church claims that he was ignorant of the overall RICO conspiracy and thus did not agree to join the conspiracy in violation of 18 U.S.C. § 1962(d). Agreement to participate in a RICO conspiracy, however, can be proved in either one of two ways: (1) by showing an "agreement on an overall objective," *United States v. Valera,* 845 F.2d 923, 929 (11th Cir.1988), *cert. denied,* 490 U.S. 1046, 109 S.Ct. 1953, 104 L.Ed.2d 422 (1989); or (2) in the absence of an agreement on an overall objective, by showing that a defendant agreed personally to commit two predicate acts and therefore to participate in a "single objective" conspiracy. *See United States v. Carter,*

721 F.2d 1514, 1531 (11th Cir.), *cert. denied,* 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984). Here, the government presented sufficient evidence that Church agreed personally to commit two predicate acts of selling cocaine. The existence of the conspiracy agreement can be inferred from "the conduct of the alleged participants or from circumstantial evidence of the scheme." *United States v. Ard,* 731 F.2d 718, 724 (11th Cir.1984) (quoting *United States v. Ayala,* 643 F.2d 244, 248 (5th Cir. Unit A 1981)).

Moreover, the government proffered evidence establishing Church's knowledge that Lee was part of a group that was distributing cocaine in Kansas City. This evidence was sufficient to convince a reasonable trier of fact that Church "must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity," thus proving agreement on an overall objective as well. *Valera,* 845 F.2d at 929 (quoting *United States v. Manzella,* 782 F.2d 533, 585 (5th Cir.), *cert. denied,* 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986)).

### B. Coppola

#### 1. *Count Five Conspiracy to Possess Cocaine with Intent to Distribute*

■ Count Five involved a conspiracy, lasting from October, 1983 to April, 1984, to locate a source of cocaine in New York. The government alleged that the participants included Coppola, co-defendant Papanier, and Biscuiti. Coppola, pointing out that the evidence on this count consists primarily of Biscuiti's testimony and that Papanier was acquitted, argues that the inconsistent verdicts show that the jury disbelieved Biscuiti and that this evidence is therefore insufficient to support the conviction. Inconsistent verdicts on a conspiracy count, however, do not defeat the propriety of a defendant's conviction, even if every defendant but one is acquitted of conspiracy. *See United States v. Andrews,* 850 F.2d 1557, 1561–62 (11th Cir. 1988), *cert. denied,* 488 U.S. 1032, 109 S.Ct. 842, 102 L.Ed.2d 974 (1989); *see also United States v. Powell,* 469 U.S. 57, 67, 105 S.Ct. 471, 478, 83 L.Ed.2d 461 (1984) (noting that sufficiency-of-the-evidence review is separate from, and should not be confused with, problems caused by inconsistent verdicts). In *Andrews,* we followed the reasoning of the Supreme Court in *Powell* that inconsistent verdicts could as easily be the result of mistake or lenity by the jury in acquittal as they could be proof of lack of evidence to support the conviction. "Under the circumstances, 'the best course to take is simply to insulate jury verdicts from review on this ground.'" *Andrews,* 850 F.2d at 1562 (quoting *Powell,* 469 U.S. at 69, 105 S.Ct. at 479). There are no grounds, therefore, for reversing Coppola's conviction on Count Five.

#### 2. *Continuing Criminal Enterprise*

■ Coppola challenges his CCE conviction on the ground that the government failed to prove at least one of the five elements of the offense.

To prove a CCE, the government must show:

    (1) a felony violation of the federal narcotics laws

    (2) as part of a continuing series of violations

    (3) in concert with five or more persons

    (4) for whom the defendant is an organizer or supervisor

    (5) from which he derives substantial income or resources.

*United States v. Boldin,* 818 F.2d 771, 774 (11th Cir.1987).

Coppola's contentions that he committed no felony narcotics violation and that evidence did not establish a continuing series of violations are without merit. The jury convicted Coppola outright on three narcotics counts, which is all that is necessary to satisfy the continuing-series element. *See United States v. Alvarez–Moreno,* 874 F.2d 1402, 1408 (11th Cir.1989), *cert. denied,* 494 U.S. 1032, 110 S.Ct. 1484, 108 L.Ed.2d 620 (1990). Further, the government presented evidence of several other CCE predicates, including the two transactions with Church.

■ Coppola next contends that the government failed to prove that (1) he acted in concert with five or more persons (2) with respect to whom he held a position as an organizer, supervisor, or manager. According to the CCE statute, the government must prove that the defendant "occupies a position of organizer, a supervisory position, or any other position of management" with respect to five or more other persons. 21 U.S.C. § 848(b)(2)(A). The Supreme Court has given this definition a "common-sense reading," finding that it "is designed to reach the 'top brass' in the drug rings, not the lieutenants and foot soldiers." *Garrett v. United States*, 471 U.S. 773, 781, 105 S.Ct. 2407, 2413, 85 L.Ed.2d 764 (1985). *See also United States v. Oberski*, 734 F.2d 1030, 1032 (5th Cir.1984) (defining these statutory terms "according to their ordinary meanings").

In *United States v. Apodaca*, 843 F.2d 421 (10th Cir.), *cert. denied*, 488 U.S. 932, 109 S.Ct. 325, 102 L.Ed.2d 342 (1988), the Tenth Circuit examined the statutory definition, noting the significance of the fact that the statute is phrased in the disjunctive: The government can prove a defendant's role as an organizer *or* a supervisor *or* any other type of manager, and the terms "can denote differing levels of managerial control and coordination." *Id.* at 426.

The Second Circuit has stated that "[i]n ordinary parlance, a relationship of supervision is created when one person gives orders or directions to another person who carries them out." *United States v. Stratton*, 779 F.2d 820, 827 (2d Cir.1985), *cert. denied*, 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986).

An organizer, on the other hand, is not "necessarily able to control those whom he or she organizes." *United States v. Ray*, 731 F.2d 1361, 1367 (9th Cir.1984). Rather, "an organizer can be defined as a person who puts together a number of people engaged in separate activities and arranges them in their activities in one essentially orderly operation or enterprise." *Apodaca*, 843 F.2d at 426 (quoting 2 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 58.21 (1977)).

The defendant need not be the only, or even the dominant, organizer, supervisor, or manager, *see United States v. Becton*, 751 F.2d 250, 255 (8th Cir.1984), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985); *United States v. Losada*, 674 F.2d 167, 174 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982), and the government need not show that the defendant had the same type of relationship with respect to each of the five or more persons. *See United States v. Smith*, 918 F.2d 1501, 1513 (11th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 253, 116 L.Ed.2d 207 (1991). Further, to satisfy the in-concert element the government need not prove that Coppola conspired with the five other persons at the same time or that the five conspired with one another. *See id.*

The government presented evidence that in the New York conspiracy, which formed the basis for Count Five, Coppola acted as a supervisor of Biscuiti and as a supervisor or organizer of Tribiano and Papanier.[8] Biscuiti, for instance, reported to Coppola on the ongoing negotiations with the potential source and had to await Coppola's approval before going ahead with the deal.

With respect to Counts Six and Seven and other CCE predicate acts, the government presented evidence that Coppola acted either as a supervisor or organizer of Lee and Rodovich, organizing the scheme, telling Lee and Rodovich what their roles would be, telling Lee when to acquire cocaine, how to dispose of the profits, and whom to contact as a source. Although the three agreed to split the profits equally, Coppola financed the scheme. Lee, whose role was to transport the cocaine, testified that he considered that he worked for Coppola.

---

**8.** As already noted, Papanier was acquitted on all counts, but we review a sufficiency-of-the-evidence claim separately. *See, supra*, I.B.1. Moreover, proof of Papanier's involvement is not crucial because the government proved that Coppola acted in concert with more than five persons.

Further, this court has held that "[a]n individual need not have direct communications with participants in order to be their supervisor.... [I]f a defendant personally hires only the foreman, that defendant is still responsible for organizing the individuals hired by the foreman to work as the crew." *United States v. Rosenthal,* 793 F.2d 1214, 1226 (11th Cir.1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987). Adding Lee underlings Caswell, Ray Fosberg ("Fosberg"), and Marilyn Jones ("Jones") for their part in the Kansas City distributions brings the total of persons acting in concert with Coppola to eight. Several other individuals arguably could be added to this total. A reasonable trier of fact could therefore find from the evidence that Coppola held a position as organizer, manager, or supervisor with respect to five or more persons.

■ Finally, Coppola claims that the government failed to prove that he derived "substantial income or resources" from the CCE. The Ninth Circuit, noting that "[i]n applying the CCE statute, other courts have wisely refrained from establishing a precise definition of what constitutes 'substantial' income or resources," has found that "[t]he practical meaning of [this term] will normally be a question for the trier of fact and its scope will develop case by case." *United States v. Medina,* 940 F.2d 1247, 1251 (9th Cir.1991). This court has held that "evidence that large amounts of cocaine and tens of thousands of dollars passed through the operation" satisfies this element. *Smith,* 918 F.2d at 1514.

The government offered evidence that in the first three Kansas City distributions and the May, 1984 transaction with Edelstein, the organization reaped approximately $140,000. "The jury may reasonably conclude that the supervisors and managers of such a lucrative operation derived income from it." *Id.* Large portions of the kilos of cocaine remaining in the possession of members of the organization count as "resources" under the statute. *See id.,* 918 F.2d at 1513–14. Under any definition, Coppola's share of this income and these resources was substantial.

## II. *Variance*

### A. Coppola

Coppola argues that he was prejudiced by a variance because the indictment alleged one RICO enterprise but the government proved two RICO enterprises at trial. A variance occurs when the evidence at trial establishes facts materially different from those alleged in the indictment. *See United States v. Johnson,* 713 F.2d 633, 643 n. 9 (11th Cir.1983), *cert. denied,* 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984). When reviewing whether a variance existed, we view the evidence in the light most favorable to the government to determine whether there is substantial evidence to support the jury verdict. *See Valera,* 845 F.2d at 928–29; *Glasser v. United States;* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). If a reasonable trier of fact could find one enterprise, then we will not find a variance. Further, reversal is warranted only if the variance (1) was material and (2) substantially prejudiced the defendant. *See United States v. Caporale,* 806 F.2d 1487, 1499 (11th Cir. 1986), *cert. denied,* 482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987).

### 1. *Material Variance*

■ Coppola argues that the government failed to prove one enterprise lasting from 1973 to 1986, proving instead two separate enterprises, one lasting from 1973 to 1980 and another that did not begin until 1983. Coppola points to differences between the enterprises in personnel, scope, purpose, and time. The government contends that a single enterprise existed, centered on Coppola and devoted to deriving income from criminal activity and protecting that income by (1) funneling it into legitimate businesses; (2) concealing the true ownership of the businesses; and (3) using violence.

The RICO statute defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961. According to the Supreme

Court in *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981), "[t]he enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct.... [It] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."

This circuit has held that proof of an association's devotion to "making money from repeated criminal activity," *United States v. Cagnina*, 697 F.2d 915, 921 (11th Cir.), *cert. denied*, 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983), demonstrates an enterprise's "common purpose of engaging in a course of conduct," regardless of whether the criminal activity is diverse. *See also United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991) (noting that under the RICO statute an enterprise can have diverse objects and that there is rarely a problem determining that the diverse acts of a criminal conspiracy, as opposed to the acts of a predominantly legitimate enterprise, satisfy the statutory requirements).

The government here presented evidence of an association in fact that consisted of Coppola and a changing roster of associates and that was, at various times, engaged in obtaining income from importing and distributing marijuana; secretly laundering the marijuana-trafficking income by funneling it into legitimate businesses; protecting this income by concealing the enterprise's ownership of the businesses; protecting Coppola's interests in the businesses by violence; distributing cocaine; and conspiring to rob a drug dealer. At all times, therefore, the enterprise was devoted to making money from repeated criminal activity, and protecting that money by any means necessary.

The government also offered "evidence of an ongoing organization, formal or informal, and ... evidence that the various as-

sociates function as a continuing unit." *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528. The enterprise started out trafficking in marijuana and then began laundering its money through legitimate businesses, primarily Jilly's. The enterprise was involved in operating Jilly's from 1978 on.[9] When the two main partners in the enterprise, Coppola and Cam, had a falling out that resulted in Cam kidnapping Coppola, Coppola began to fear for his continued control over the enterprise's assets, and he sought protection from organized crime figures. Paying for this protection depleted Coppola's assets and put him in debt to Biscuiti. Continuing to feel a threat from Cam, Coppola had Forgione kill Cam. When Forgione began to threaten Coppola's control of the enterprise, Coppola conspired to have him killed as well. Meanwhile, the debt to Biscuiti and financial troubles, which were a direct result of the dispute over control over the assets of the enterprise, prompted the enterprise to turn to robbery and trafficking in cocaine.

The personnel of the enterprise was not the same from beginning to end, but as it shifted, it displayed continuity. As participants left the enterprise, others joined, each becoming involved in multiple aspects of the enterprise. In *United States v. Hewes*, 729 F.2d 1302, 1311 (11th Cir.1984), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985), we explicitly rejected "the contention that *Turkette*'s reference to the enterprise as a 'continuing unit' requires participation of all of its members throughout the life of the enterprise" and found that "shifting associations" whose participants "overlapped to a significant degree" formed an enterprise under the statute. *Id.*

Here, Coppola and Biscuiti were involved in all phases of the enterprise: trafficking in marijuana, funneling profits into Jilly's, operating Jilly's, conspiring to traffic in cocaine, and conspiring to murder those who posed a threat to the enterprise. Par-

---

**9.** The burden on the government with respect to the "enterprise" element is to prove an association-in-fact. The association-in-fact, it goes without saying, does not have to be purely criminal in nature. The marijuana-trafficking associates' participation in the operation of Jilly's shows that the association-in-fact continued to exist through 1981 and 1982.

ticipants in the marijuana-trafficking aspect of the enterprise with connections to Jilly's included Coppola, Cam, Biscuiti, Fisher, and Wotocek. When the enterprise was concerned with protecting Coppola's interests in Jilly's, new associates, including Forgione, Papanier, and then Lee, arrived. Papanier participated in the operation of Jilly's. Coppola, Lee, Biscuiti, and Papanier participated in both the murder-conspiracy and cocaine-trafficking aspects of the enterprise.

Coppola argues that the three-year gap separating the marijuana predicates from the cocaine and murder-conspiracy predicates in the indictment demonstrates that there was not one single enterprise because there was no "continuity and relationship," between the 1970s predicates and the 1983–84 predicates. This contention is unfounded, however, because Coppola's claim is that he suffered from a material variance because two *enterprises* were proved. "Continuity and relationship" of predicate acts prove the pattern-of-racketeering-activity element, not the enterprise element. The pattern of racketeering activity must not be confused with the enterprise. These are two separate and distinct elements of the offense. *See Turkette*, 452 U.S. at 582–83, 101 S.Ct. at 2528–29. A three-year gap in predicate acts, therefore, does not equal a termination of the enterprise. Here, the enterprise displayed continuity through the early 1980s because its participants associated in their illegal investment in, concealed control of, and operation of, Jilly's.[10] We find, for the above reasons, that the evidence was sufficient for a reasonable trier of fact to find the existence of one enterprise and that, therefore, no variance existed.

### 2. *Substantial Prejudice*

█ Assuming *arguendo* that Coppola could demonstrate a material variance, he could not show prejudice. With respect to variances in conspiracy or RICO cases, we stated in *Caporale:*

> The courts have found prejudice to substantial rights from a material variance in two circumstances: 1) where the proof at trial differed so greatly from the charges in the indictment that the defendant was unfairly surprised and had an inadequate opportunity to prepare a defense, and 2) where there are so many defendants and so many separate conspiracies before the jury that there is a substantial likelihood that the jury would transfer evidence from one conspiracy to a defendant involved in another conspiracy.

*Caporale*, 806 F.2d at 1500 (citations omitted).

First, it was clear from the indictment that the government intended to prove an enterprise that encompassed both the marijuana activities of the 1970s and the cocaine activities of 1983–84. Coppola could not have been unfairly surprised. Second, Coppola could not have been prejudiced by a jury transferring evidence from an enterprise in which he was not involved because he was involved in both enterprises.

### B. Church[11]

Again, assuming *arguendo* that the government proved two enterprises rather than one, Church also could not have been prejudiced by unfair surprise. Neither could he have been prejudiced by the possibility that evidence of the marijuana enterprise could be transferred to him because he also was involved in the marijuana enterprise. The aspects of the enterprise in which Church was not alleged to have been involved—the murder conspiracies, the robbery, and funneling of illicit profits into legitimate businesses—were not the subject of appellants' claim of a variance.

---

**10.** Further, a three-year gap between the commission of predicate acts does not in and of itself amount to failure to prove a pattern of racketeering activity because the RICO statute itself allows for a gap of up to ten years between predicate acts. *See* 18 U.S.C. § 1961.

**11.** Church does not argue that he was substantially prejudiced by a variance, but appellants state in their briefs that they adopt each other's arguments.

## III. *Evidence of Cam Murder Conspiracy*

■ Coppola's next argument for reversal is that the district court erred in failing to exclude evidence of a conspiracy to murder Cam, Coppola's longtime friend and partner, because its probative value is substantially outweighed by the danger of unfair prejudice under Fed.R.Evid. 403. The government did not charge this murder conspiracy in the indictment, either as a separate count, a RICO predicate act, or an overt act in furtherance of the RICO conspiracy. We review a district court's decision to admit evidence under an abuse of discretion standard. An appellant must show that the district court clearly abused its discretion, *see United States v. O'Keefe,* 825 F.2d 314, 319 (11th Cir.1987), and that the error was not harmless. *See* Fed. R.Crim.P. 52(a); *United States v. Eason,* 920 F.2d 731, 735 (11th Cir.1990).

Coppola also argues that the district court should have excluded the evidence under Fed.R.Evid. 404(b) as inadmissible character evidence. Because Coppola failed to raise this objection in the district court, we review the Rule 404(b) claim under the plain error standard. *See* Fed. R.Crim.P. 52(b). "Plain error, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity and public reputation of judicial proceedings." *United States v. Walther,* 867 F.2d 1334, 1343–44 (11th Cir.), *cert. denied,* 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 103 (1989).

The government argues that evidence of the Cam murder conspiracy was necessary to provide Coppola's motive for, and tell the full story of, the Forgione murder conspiracy, which was charged in the indictment as a RICO predicate act. At trial, the government offered proof that a dispute over money from Jilly's prompted Cam to kidnap Coppola. After his release, Coppola recruited Forgione to protect him from Cam. When Coppola perceived that Cam continued to pose a threat to him, he had Forgione kill Cam. The government presented further evidence that Coppola and Forgione then had disputes over the payment for the murder, which prompted Coppola to fear Forgione and conspire to have him killed as well. The story of the Forgione murder conspiracy would be incomplete without knowledge of the Cam murder conspiracy.[12]

In *United States v. Williford,* 764 F.2d 1493, 1499 (11th Cir.1985), we stated, "Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if ... [it] forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." In such a situation, because the evidence is intrinsic, not extrinsic, we do not engage in a Rule 404(b) analysis. *See id.*

Such evidence is, of course, nevertheless subject to a Rule 403 balancing. *See United States v. Huppert,* 917 F.2d 507 (11th Cir.1990). "[T]he court's discretion to exclude evidence under Rule 403 is narrowly circumscribed. 'Rule 403 is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence.'" *United States v. Norton,* 867 F.2d 1354, 1361 (11th Cir.), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 701 (1989). Although certainly prejudicial, evidence of the Cam murder conspiracy was not *unfairly* prejudicial. Any risk that the jury would have been tempted to punish Coppola for the Cam murder conspiracy is outweighed by the importance of the evidence to proving the Forgione murder conspiracy. We find, therefore, that the district court did not abuse its discretion in admitting this evidence.

## IV. *Exhibit 610—Tape Recorded Conversation with Hirsch Friedman*

■ Coppola next argues that he was also unfairly prejudiced by the district

---

**12.** Coppola claims that the prosecutor cannot have been trying to prove the Forgione murder conspiracy because he admitted at trial that Forgione was killed by other parties. Whether or not this admission was made is irrelevant because the predicate act charged in the indictment was murder *conspiracy,* not murder. The government presented ample evidence that Coppola *conspired* to murder Forgione, whether or not he was involved in the actual murder.

court's decision to admit into evidence portions of Government Exhibit 610, which consisted of a tape recording of an August 28, 1979 conversation between Coppola, Hirsch Friedman ("Friedman"), an Atlanta lawyer who was also a government informant, and John Collicutt ("Collicutt"), an Atlanta zoning inspector. The court ordered that certain portions of the conversation be redacted on grounds of prejudice or lack of relevancy, but admitted into evidence a portion in which Coppola and Friedman discussed finding a hit man to kill a prosecutor for a third party who was not present. Again, we review under an abuse of discretion standard, reversing only if appellant can prove that the error was not harmless.

Friedman, on behalf of a "guy" who wanted to "knock off" a prosecutor, asked Coppola for help finding someone to do the job. Coppola, after protesting that he would never consider killing a prosecutor

for anyone but himself, nevertheless offered to contact someone. Coppola said that he would not agree to be present to make the introductions, noting that there is no statute of limitations on murder.[13]

## A. Abuse of Discretion

Coppola argues that the evidence was inadmissible under Rule 404(b) because it was used solely to show his bad character. Rule 404(b) states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

A decision whether to admit evidence of extrinsic acts is guided by a two-part test. In *United States v. Roe*, 670 F.2d 956, 967

---

**13.** The court introduced into evidence Government Exhibit 610B, which is a transcript of the tape recorded conversation. The relevant excerpt follows. The government identified the parties by their first names.

> HIRSCH [Friedman]: See, don't laugh, I've got ah a guy who's very interested in ah some extra[ ]curricular assistance but he's looking at something very, very heavy. Guy approached me with knocking off ah a prosecutor.
> CARL [Coppola]: Oh, man, he['s] talking, I mean that's [...]
> JOHN [Collicutt]: That's that's ...
> CARL: I wouldn't consider something like that, or even calling anybody I know that could do it. I mean I wouldn't consider myself.
> JOHN: (Unintel.) Right ... period that's ...
> CARL: Unless it was for me, and I wouldn't even consider it for myself.
> HIRSCH: Oh, but the dollars involved were so large.
> JOHN: It doesn't matter, ah ...
> HIRSCH: All I was gonna do is just introduce him to somebody.
> CARL: *I can get the man and introduce [']em, but you introduce him to the man, to my guy [']cause I don't even wanna be there. I'll send my guy, I'll bring the guy down that will do the f\* \* \* \* \* \* job for him but he's gonna come right to your office. And I'll call you on the phone and tell you that's the man and you do the introductions.*
> HIRSCH: That though very much concerns me, I ...
> CARL: I don't want no part of that.

> HIRSCH: I had somebody try that before and I swore he was a cop and I just, you know, I don't know what you're talking about, pal.
> CARL: I don't want, s\* \* \*, I don't want no part [of] that s\* \* \*.
> JOHN: (Unintel.)
> CARL: Because you know, the m\* \* \* \* \* f\* \* \* \* that you do it for ...
> JOHN: Right.
> CARL: He gets busted for a f\* \* \* \* \* \* nickel, something, ya know, he's gonna get five years, he says hell ...
> HIRSCH: That's right.
> CARL: Well I know this guy and he does so and so.
> HIRSCH: Yeah.
> JOHN: That's right, so he doesn't have to serve his five years and you gotta get the, you get the chair.
> CARL: Only time I do anything like that's for me. If I get something for me then I'll, I'll worry about me, but I ...
> HIRSCH: Right.
> CARL: But I ain't f\* \* \* \* \* worried about nobody else.
> HIRSCH: Nobody else.
> CARL: No, because that, [']cause there ain't no statute of limitations on that s\* \* \*, man.
> JOHN: That's it.
> CARL: And some f\* \* \* \* \* get his nickel or dime and I say well I can tell you this.
> JOHN: Yep, [t]here's no ...
> CARL: I been offered a lot of money just to do s\* \* \* like that and I don't want no f\* \* \* \* \*, not me do it, you know, get somebody do it.

(Expletives deleted and emphasis added.)

(11th Cir.); *cert. denied,* 459 U.S. 856, 103 S.Ct. 126, 74 L.Ed.2d 109 (1982), we stated:

> Extrinsic offense evidence is admissible only if (1) the evidence is relevant to an issue other than the defendant's character, and (2) the probative value of the evidence is not substantially outweighed by undue prejudice.

With respect to the first prong of the test, the government contends that Exhibit 610 was used to prove Coppola's willingness to use violence to protect his interest in Jilly's and was therefore relevant to proving Coppola's intent to participate in the murder-conspiracy RICO predicates. The government cites *United States v. Beale,* 921 F.2d 1412 (11th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 99, 116 L.Ed.2d 71 (1991), for the proposition that evidence of extrinsic, uncharged acts is admissible under Rule 404(b) to prove intent to commit similar crimes.

We stated in *United States v. Pollock,* 926 F.2d 1044, 1048 (11th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991), that "[p]roof that one is a bad man generally is not, under our system, admissible to prove that one committed a specific bad act.... But what appears to one person as propensity may be intent to another; the margin between is not a bright line." Assuming that a willingness to facilitate the murder of a prosecutor for a third party is relevant to proving intent to participate in a murder conspiracy aimed at protecting business interests, we turn to the second prong of the test, which is simply a Rule 403 balancing.

In *Beale,* we noted that "[t]his Court has generally held that if the extrinsic acts require the same intent as the charged offenses *and if* these acts are proximate in time to the charged offenses, then the extrinsic act is highly probative." *Beale,* 921 F.2d at 1427 (emphasis added). Here, the government introduced a tape recording of a 1979 conversation to prove intent to commit predicate acts that occurred in early 1984, nearly four and a half years later. Even the uncharged Cam murder conspiracy was not hatched until mid–1983, nearly four years after the tape recorded conver-

sation. If the phrase "proximate in time" is to have any meaning in these circumstances, this 1979 conversation cannot be considered "highly probative" to acts committed in 1983 and 1984.

On the other side of the balancing, showing a willingness to facilitate the murder a prosecutor is the type of extrinsic act likely to incite a jury to an irrational decision. *See United States v. Tunsil,* 672 F.2d 879, 881 (11th Cir.), *cert. denied,* 459 U.S. 850, 103 S.Ct. 110, 74 L.Ed.2d 98 (1982). In *United States v. Hewes,* 729 F.2d 1302, 1315 (11th Cir.1984), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985), we noted that "such irrationality is the primary target of Rule 403." Further, the evidence was also cumulative. *See id.* The government already had presented several witnesses to the two charged and the one uncharged murder conspiracies who testified to Coppola's words, actions, intent, and motivation. With respect to the uncharged Cam murder conspiracy, for instance, the government offered testimony that Forgione stated to Coppola in the presence of others that Forgione had killed Cam for Coppola and that Coppola had not denied this statement. In presenting evidence of Coppola's 1979 conversation with Friedman, the government seems guilty of overkill. This tape recorded conversation is much closer to inadmissible character evidence—showing that Coppola is the *type of person* who would agree to facilitate the murder of a prosecutor—than to evidence probative of Coppola's intent four years later.

We recognize that this circuit has found that an extrinsic offense committed approximately five years before the charged offense was not too remote to be admissible under Rule 403. *See United States v. Bennett,* 848 F.2d 1134, 1137 (11th Cir.1988). We have also noted, however, that "decisions as to impermissible remoteness are so fact-specific that a generally applicable litmus test would be of dubious value." *Pollock,* 926 F.2d at 1048. As a guide to the specific facts before us, the former Fifth Circuit has noted that "prior crimes involving deliberate and carefully premeditated

intent—such as fraud and forgery—are far more likely to have probative value ... than prior crimes involving a quickly and spontaneously formed intent—such as assault." *United States v. San Martin,* 505 F.2d 918, 923 (5th Cir.1974).[14]

In *Bennett,* the five-year-old extrinsic act deemed admissible involved a conspiracy to import cocaine, which, one may suppose, took careful planning and premeditation. Here, the four-year-old extrinsic act was Coppola's participation in a conversation, initiated by someone else, in which he indicated his willingness to make a connection with a person who would murder a prosecutor. Coppola's offer to make the connection could only have demonstrated "a quickly and spontaneously formed intent."

We also recognize Rule 403's strong presumption in favor of admissibility and the deference this court must give to the discretion of the district court. *See United States v. Elkins,* 885 F.2d 775, 784 (11th Cir.1989), *cert. denied,* 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990). We nevertheless find that the district court abused its discretion in admitting this evidence, the probative value of which was substantially outweighed by the danger of unfair prejudice.

### B. Harmless Error

We hold, however, that appellant has failed to show that the district court's abuse of discretion was not harmless error. In *United States v. Christopher,* 923 F.2d 1545, 1552 (11th Cir.1991), we held that a district court's erroneous ruling admitting testimony did not warrant reversal "because the errors had no substantial influence on the outcome, and sufficient evidence supports the jury's verdict." Here, the error would not have had a substantial influence on the outcome. As noted previously, the jury's three convictions on Counts Five through Seven, which were also listed as RICO predicate acts, in and of themselves showed that there was sufficient evidence to convict on RICO and

RICO conspiracy. Further, Coppola has never contested the great majority of the predicate acts detailing his involvement in marijuana trafficking. The evidence to convict Coppola of RICO and RICO conspiracy, based on proof of these and other predicate acts, was overwhelming. In addition, the Friedman recording was admitted at the end of the prosecution's case in an extremely lengthy trial, which certainly cannot be presumed to be free of error, and the jury's acquittal of Coppola on Count Four indicated that it was not so influenced by the recording that it could not weigh the evidence against him. *Cf. Manzella,* 782 F.2d at 543 (finding that jury's ability to discern defendant's innocence on some counts indicated that media coverage did not deprive defendant of right to impartial jury).

### CONCLUSION

For the above reasons, we AFFIRM appellants' convictions, with the exception of Coppola's convictions on Counts Five and Seven, which, having merged with his CCE conviction, we VACATE.

---

14. Decisions of the former Fifth Circuit handed down before October 1, 1981 are binding precedent in this Circuit. *See Bonner v. City of Prich-* *ard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).