**BCCI HOLDINGS (LUXEMBOURG), SOCIETE ANONYME, et al., Plaintiffs,**

v.

**Sheikh Khalid Bin MAHFOUZ, et al., Defendants.**

Civ. A. No. 92–2763 (JHG).

United States District Court, District of Columbia.

July 26, 1993.

Michael Nussbaum, James P. Davenport, Eric L. Lewis and A. Katherine Toomey, Nussbaum and Wald, Washington, DC, for the court-appointed fiduciary.

Gary P. Naftalis, Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City and Andrew Lewis Frye, Mayer, Brown & Platt, Washington, DC, for Sheikh Khalid Bin Mahfouz.

Andrew J. Levander, Shereff, Friedman, Hoffman & Goodman, New York City and Plato Cacheris and Preston Burton, Cacheris & Treanor, Washington, DC, for Haroon Rashid Kahlon.

Gerald Feffer, Stephen A. Steinbach and Douglas R. Marvin, Williams & Connolly, Washington, DC, for Nat. Commercial Bank, Saudi Arabia.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

This action was commenced on December 9, 1992 with the filing of a complaint and a motion for an *ex parte* temporary restraining order by the plaintiffs, BCCI Holdings (Luxembourg), Societe Anonyme, incorporated under the laws of Luxembourg; Bank of Credit and Commerce International, Societe Anonyme, incorporated under the laws of Luxembourg; Bank of Credit and Commerce International (Overseas) Limited, incorporated under the laws of the Cayman Islands; and International Credit and Investment Company (Overseas) Limited, incorporated under the laws of the Cayman Islands (collectively "BCCI"). The plaintiffs, presently involved in liquidation proceedings commenced abroad, are participating in this action through liquidators appointed by courts of England, Luxembourg, and the Cayman Islands. Named as defendants are Sheikh Khalid bin Mahfouz ("Mahfouz"), a citizen and resident of Saudi Arabia; Haroon Rashid Kahlon ("Kahlon"), a citizen and resident of Pakistan with other residences in England and Saudi Arabia; and National Commercial Bank, Saudi Arabia ("NCB"), a bank organized under the laws of Saudi Arabia. Presently pending are defendants' motions to dismiss for lack of personal and subject matter jurisdiction, *forum non conveniens*, and failure to state a claim for which relief can be granted. Upon consideration of the voluminous filings relating to the motions and arguments presented at the hearing held June 30, 1993, this action is conditionally dismissed on the ground of *forum non conveniens*.

## BACKGROUND

The complaint alleges that from January 1986 until the worldwide shutdown of BCCI in July 1991, the defendants engaged in numerous and continuous fraudulent transactions with respect to the control of BCCI and Credit and Commerce American Holdings N.V. ("CCAH"), a Netherlands Antilles corporation, in violation of the Racketeer Influenced and Corrupt Organizations Act

("RICO"), codified at 18 U.S.C. §§ 1961 *et seq.*, and the common law. Though the complaint asserts that the alleged scheme giving rise to plaintiffs' claims involves many complex transactions, the allegations can be categorized into three basic groups.

First, plaintiffs contend that the defendants conspired with Agha Hasan Abedi, the founder of BCCI and its chairman from 1973 until approximately 1988, and Swaleh Naqvi, Vice President of BCCI from 1973 until 1988, to acquire for Mahfouz and NCB shares of BCCI and CCAH as well as capital notes in BCCI. The terms of the acquisitions were set out in a document dated July 24, 1986 entitled "Procurement Deed." According to plaintiffs, the defendants' acquisitions were fraudulently recorded on the books of NCB and BCCI, which consequently presented a deceitful picture of the financial position of BCCI to creditors, depositors, and regulators.

Second, plaintiffs allege that the defendants furthered their scheme by insisting that BCCI repurchase the BCCI and CCAH shares claimed to have been illegally purchased by Mahfouz and NCB and that the repurchase was not disclosed to regulators and was effected through fraudulent accounting. In addition, the complaint asserts that the defendants knew that the repurchase was funded with money stolen from BCCI depositors.

Third, plaintiffs allege that NCB and Mahfouz, with the assistance of Kahlon, illegally agreed to have NCB assume on its books over $200 million in non-performing BCCI loans. It is claimed that through their participation in these three clusters of activities, Mahfouz, Kahlon, and NCB played a significant role in creating the $10.5 billion loss suffered by BCCI, its creditors, and its depositors. Among other relief, the complaint seeks money damages in excess of $10.5 billion trebled under RICO, attorneys' fees, and costs.

An *ex parte* hearing on plaintiffs' motion for a temporary restraining order was held on December 9, 1992, and the Court granted the motion the following day, enjoining Mahfouz, Kahlon, their agents and employees, and any person or entity controlled by them or acting on their behalf from withdrawing, transferring, removing, dissipating, or disposing of funds, assets or other property beneficially owned by Mahfouz or Kahlon within the United States. The temporary restraining order was extended on December 17, 1992 pursuant to Fed.R.Civ.P. 65(b).

Plaintiffs filed an application for a preliminary injunction on December 14, 1992, and the temporary restraining order was further extended upon stipulation of the parties until the application could be resolved. A hearing on the application was held on February 1, 1993 and on February 12 the Court issued a preliminary injunction restraining Mahfouz and his agents. No preliminary injunction was issued against Kahlon, however, due in substantial part to the findings that he had no meaningful assets in the United States and that there was an insufficient showing of irreparable harm in the absence of an injunction against him. Although the Court found a substantial likelihood of success against both Mahfouz and NCB, it "candidly concede[d] that it [would] need further study before making a final decision regarding personal and subject matter jurisdiction." February 12, 1993 Order at 7. Mahfouz filed a notice of interlocutory appeal of the preliminary injunction on March 12, 1993 but thereafter pressed ahead to discovery and a resolution of his motion to dismiss this action.

Mahfouz and NCB filed motions to dismiss on February 1, 1993. By an Order issued eight days later, the parties were allowed to take discovery on the issues raised in the motions to dismiss, including those relating to *forum non conveniens.* Due to a conflict between the parties concerning whether Kahlon had been properly served with the summons and complaint, a dispute eventually resolved by stipulation, Kahlon did not file his motion to dismiss until May 14. As with the other motions to dismiss, discovery was taken on issues raised in Kahlon's motion, and several disputes relating thereto were resolved in written Orders. The defendants were given an opportunity to supplement their motions, and plaintiffs filed oppositions based in large part on facts ascertained through depositions and interrogatories. Although the hearing on the motions to dismiss

was held on June 30, 1993, the parties continued to supplement their filings until as recently as July 12, 1993.

## DISCUSSION

 The standard for resolving a motion to dismiss for *forum non conveniens* is well settled in this Circuit. In *Pain v. United Technologies Corp.*, 637 F.2d 775 (D.C.Cir. 1980), *cert. denied*, 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981), the Court of Appeals instructed:

> [A] district judge's *forum non conveniens* inquiry should proceed in four steps. As a prerequisite, the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case. Next, the trial judge must consider all relevant factors of *private* interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice. If the trial judge finds this balance of private interests to be in equipoise or near equipoise, [s]he must then determine whether or not factors of *public* interest tip the balance in favor of a trial in a foreign forum. If [s]he decides that the balance favors such a foreign forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

637 F.2d at 784–85 (emphasis in the original). *Forum non conveniens* is a flexible doctrine, *see Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249, 102 S.Ct. 252, 262–63, 70 L.Ed.2d 419 (1981), and although there is ordinarily a strong presumption in favor of a plaintiff's choice of forum, the presumption is applied with less force when the plaintiff or the real parties in interest are foreign. *See id.* at 255–56, 102 S.Ct. at 265–66; *In re Disaster at Riyadh Airport*, 540 F.Supp. 1141, 1144 (D.D.C.1982).

## A. ADEQUATE ALTERNATE FORUM

 The threshold prong of the *forum non conveniens* inquiry set forth in *Pain* requires the Court to examine whether an alternate forum exists and, if so, whether that forum is adequate. As the Supreme Court explained in *Reyno*:

> Ordinarily, this [threshold] requirement will be satisfied when the defendant is 'amenable to process' in [another] jurisdiction. In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied. Thus, for example, dismissal would not be appropriate where the alternate forum does not permit litigation of the subject matter of the dispute.

454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 506–07, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947)).

 The defendants posit that England is both an available and adequate forum, relying heavily on the fact that the court-appointed liquidators for the four plaintiffs commenced a proceeding against them in England on the same day this case was filed. The English case was grounded on the same allegations forming the basis of the complaint filed here and seeks $10.5 billion in damages.[1] Although the plaintiffs conceded at oral argument "in general that England ... is a forum that is available if the Defendants wish to make it so; that it is adequate as a general proposition," Statement of Michael Nussbaum, Transcript of June 30, 1993 Motions Hearing ("Tr.") at 79, they vociferously argue that the defendants have actively challenged the jurisdiction of the English court and have thereby made England unavailable for the resolution of their claims.

The changing positions of two of the three defendants regarding the English court's jurisdiction over them and the parties' shifting and conflicting opinions concerning the meaning of "jurisdiction" within the English legal system initially and unduly complicated the issue of whether England is an available forum. Additionally, much confusion has been caused by the fact that English law does not appear to have exact equivalents to our system's doctrines of personal and sub-

---

1. A copy of the liquidators' Application to the High Court of Justice is attached as Exhibit 4 to the May 5, 1993 Renewed Motion of the National Commercial Bank to Dismiss the Complaint.

ject matter jurisdiction. It is unnecessary to recount the past procedural history in England or prior disputes voiced in this forum concerning jurisdiction abroad, however, given that the parties' positions on English jurisdiction are now settled and in focus.

As it stands today, none of the defendants assert that the English court does not have the power to adjudicate the claims against them because of improper service of process, lack of sufficient contacts with the forum, or inconvenience of that forum. Rather, it appears that the only challenges made by defendants to the English court's jurisdiction are "motions to strike," analogous to our motions to dismiss, which allege that section 426 of the English Insolvency Act does not permit the application of English substantive law to the claims of Bank of Credit and Commerce International (Overseas) Limited ("Overseas"). The liquidators have strongly contested those motions but report to this Court that should the motions succeed, the English court will not have the authority to resolve Overseas' claims on their merits, at least under section 426. Significantly, however, the plaintiffs have asserted to the English court that even were section 426 found inapplicable to Overseas' claims, those claims could still be prosecuted in the English forum under a different provision of the Insolvency Act through a winding up proceeding. When asked by Mr. Justice Rattee in a hearing in England, "[J]ust assume for the purpose of argument that I decided against you on construction of 426 . . ., you say you could go tomorrow to the Cayman Island judge and say 'Issue another request', asking the English court to make a winding-up order, and we will have a go at that," counsel for the liquidators responded, "Yes, I could. . . ." Transcript of the July 1, 1993 proceeding before the English court, attached as Exhibit G to Kahlon's July 8, 1993 Supplemental Statement, at 75. Counsel continued, "The liquidators of Overseas causing Overseas to present its own petition to wind itself up here [in England], it would be said that there is a reasonable possibility of success. Your Lordship can see the argument." Justice Rattee responded, "Yes." *Id.* at 88.

Although the defendants have represented to this Court that they would withdraw their section 426 defense if such a withdrawal were made a condition of dismissal of this case for *forum non conveniens*, the English Justice understandably has indicated that the defendants could not confer subject matter jurisdiction on his court were the statute found to be inapplicable. *See* Transcript of July 7, 1993 proceedings before the English court, attached as Exhibit 9 to Court Appointed Fiduciaries' Submission Regarding Jurisdiction Over Kahlon, at 48. Nonetheless, because of the liquidators' strong representations to the foreign court that Overseas' claims could be adjudicated in England under an alternate provision of the law, and because the defendants have represented that they are not asserting any other jurisdictional defenses, based on the record herein it is most likely that the English court will have the authority to resolve all of the claims brought by all of the liquidators in the related action. Accordingly, this Court finds that England is both an adequate and available alternative forum for the resolution of this dispute and, therefore, that the threshold prong of the requisite *forum non conveniens* inquiry is satisfied. In the unlikely event that the English court determines that it does not have jurisdiction over the claims of the Overseas liquidators or over the defendants, this conclusion will be reconsidered upon request of the plaintiffs.

## B. FACTORS OF PRIVATE INTEREST

When examining and balancing private interests during a *forum non conveniens* inquiry, a number of matters are considered: ease of access to sources of proof, the availability of compulsory process for attendance of unwilling witnesses, the cost of obtaining attendance of willing witnesses, and other problems that interfere with an expeditious and inexpensive trial. *See Reyno,* 454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6 (quoting *Gilbert,* 330 U.S. at 508, 67 S.Ct. at 843); *Pain* at 786; *Lockman Found. v. Evangelical Alliance Mission,* 930 F.2d 764, 769 (9th Cir.1991). Much of the conflict between the parties concerning which forum can provide the easiest access to sources of proof is due to the international scope of this

case as well as the relatively early stage of this litigation. The plaintiffs have asserted that this forum has the best access to proof because many of the documents relating to the alleged scheme are located with the Board of Governors of the Federal Reserve System in the District of Columbia and because other relevant documents collected by the BCCI team investigating this matter are maintained in identical sets in Washington and London. Significant documents obtained from Abu Dhabi are also asserted to be located in both the United States as well as England. The defendants vigorously dispute that this forum provides the easiest access to sources of proof and assert that due to the almost completely foreign nature of the matter, the extensive fraud alleged to have been committed, the substantial questions of proximate cause, and the monumental proportion of the damages which plaintiffs seek, the litigation of this case will require the examination of documents and witnesses located primarily in England.

█ The record, as it currently exists, clearly reflects that defendants' position regarding the location of sources of proof is significantly more realistic than plaintiffs'. All of the plaintiffs are foreign entities, and Touche Ross, the lead global liquidator of BCCI and one of the primary investigators of its collapse, is headquartered in England. As the Supreme Court has recognized, "When the [plaintiffs'] home forum has been chosen, it is reasonable to assume that this choice is convenient. When the plaintiff is foreign, however, this assumption is much less reasonable." *Reyno,* 454 U.S. at 255–56, 102 S.Ct. at 265. In addition, the large majority of the material acts of fraud mentioned in the complaint are alleged to have occurred abroad. For example, the Procurement Deed, which is at the heart of the complaint, was drafted in England, executed in England and Luxembourg, and contains choice of law provisions referring to English and Luxembourg law.

Further, because the plaintiffs are claiming that the entire collapse of BCCI is attributable to the fraud of the defendants, litigation of this action certainly will involve complex issues of proximate cause. Indeed, the defendants have already asserted that the financial decimation of BCCI was caused not by their fraud but by acts and omissions of English auditors, regulators, and former employees of BCCI. Resolution of this matter will therefore require examination of a large majority of documents and witnesses located in England involving those persons and entities. Moreover, it is evident that sources of proof relating to damages will be more easily obtained in England than in this forum. As discussed in more detail below, almost all of the ultimate beneficiaries of this suit, the depositors and creditors of BCCI, are located abroad and most of the documents relating to losses suffered by them are in England rather than here. One of the more telling statements establishing England as the more convenient forum with respect to sources of proof is the concession of liquidator Christopher Morris that there may be as many as one hundred million documents located in the United Kingdom which relate to BCCI's activities and ultimate collapse. *See,* March 3, 1993 Deposition of Christopher Morris, attached as Exhibit 2 to NCB's Renewed Motion to Dismiss, at 62–63. No similar representations relating to the scope of the documents located here have been made.

The availability of compulsory process for attendance of unwilling witnesses, another factor to be considered when weighing private interests, also favors litigation of the instant dispute in London rather than here. For reasons stated above, many crucial third party witnesses live in England and in other foreign countries and would therefore be outside of the reach of this Court's subpoena power. Significantly, Price Waterhouse (UK), the London-based auditing firm of BCCI whose members are potentially key witnesses for the defense, if not also for the prosecution, of this case, has already indicated a refusal to comply with United States subpoenas in relation to BCCI matters. *See* J. Kerry & H. Brown, The BCCI Affair, A Report to the Committee on Foreign Relations, United States Senate, 102nd Cong., 2d Sess. (December 1992) at 257–58, attached as Exhibit 9 to NCB's Renewed Motion to Dismiss. While plaintiffs may be correct that the discovery mechanisms of the United States are generally more favorable than

those of other countries including England, this Circuit has concluded that "they are far from perfect," *Pain* at 788, and such benefits probably would not outweigh the loss of power to compel the production of numerous witnesses and documents at trial. *See Syndicate 420 at Lloyd's, London v. Glacier Gen. Assurance Co.,* 604 F.Supp. 1443, 1448 (E.D.La.1985) ("[T]he process of using letters rogatory to request the courts in London to issue subpoenas for depositions of foreign witnesses is a cumbersome, expensive and time-consuming process that should be avoided when possible.... [J]ustice is better served by allowing the parties to resolve the dispute in a forum where the ease of access to sources of proof is more accommodating and the court can compel the production of all relevant documents and witnesses.")

Given the conclusion that more material witnesses are likely to be located in England than in the United States, the costs of obtaining willing witnesses, another relevant factor of the private interest balance, would be substantially reduced by litigating this matter in London. Adding additional support to this conclusion is the request made by BCCI's liquidators in a proceeding before the United States Bankruptcy Court for the Southern District of New York for a restraining order enjoining creditors of Overseas and BCCI SA from commencing or continuing any judicial, administrative, or regulatory actions against BCCI or their property in the United States. Among other reasons for seeking the injunction, the liquidators stated, "the commencement of other actions [against BCCI] in the United States would cause the insolvent estates to incur needless additional expense to engage in litigation thousands of miles from the forums handling the insolvency." Memorandum of Law in Support of Application of Foreign Representatives for Order to Show Cause and Temporary Restraining Order, *In re Petition of Brian Smouha,* No. 91–B–13569, at 15 (Bankr. S.D.N.Y. Aug. 2, 1991), attached as Exhibit 10 to NCB's Renewed Motion to Dismiss. Though the nature of many of the claims which were the subject of the restraining order in that proceeding may be somewhat different than the types of allegations raised in the case *sub judice,* issues relating to the

insolvency of BCCI will play a major role in this litigation and would be less costly to explore and resolve in England, where the bulk of the liquidation proceedings are taking place.

Yet another private interest factor supporting dismissal of this case for *forum non conveniens* is the existence of the virtually identical proceeding in England. Dismissal of this suit in favor of the English litigation clearly will relieve the defendants of the burdens of litigating parallel proceedings and will negate the possibility of inconsistent judgments. *See, Contact Lumber Co. v. P.T. Moges Shipping Co., Ltd.,* 918 F.2d 1446, 1452 (9th Cir.1990). *Cf., Dept. of Economic Dev. v. Arthur Andersen & Co. (U.S.A.),* 683 F.Supp. 1463, 1485 (S.D.N.Y.1988) ("a 'litigant is entitled to his day in one court, but not in two.'") (quoting *Rosenfeld v. Black,* 445 F.2d 1337, 1341 n. 5 (2d Cir.1971)).

In short, and giving the deference due to plaintiffs' choice of forum, the balance of the private factors favors dismissal of this case for *forum non conveniens.*

## C. FACTORS OF PUBLIC INTEREST

■ Even had the balance of private factors not tipped in favor of dismissal, the relevant factors of public interest overwhelmingly favor granting defendants' motions. The public interest factors which must be considered when resolving a motion to dismiss for *forum non conveniens* include the local and national interests in having controversies resolved in the localities in which they arise; the burdens associated with trying the case in a particular forum such as docket congestion, other administrative difficulties, and the burden of jury duty; and the avoidance of problems concerning conflict of laws or the application of foreign law. *See Reyno,* 454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6 (citing *Gilbert,* 330 U.S. at 509, 67 S.Ct. at 843); *Pain,* 637 F.2d at 791–92; *Riyadh Airport,* 540 F.Supp. at 1151.

Unquestionably, the interests of the United States and the District of Columbia in the resolution of this dispute are sizeable. But even more substantial are the interests of England in the disposition of the matter.

The plaintiffs are Luxembourg and Caymanian entities which have been placed under supervised liquidation by courts in England, Luxembourg, and the Cayman Islands, and the BCCI liquidators have acknowledged that "[t]he overwhelming majority of BCCI's activities were undertaken or controlled from England" during the time periods relevant to this litigation. Joint Provisional Liquidators' Report, July 19, 1991, at 6, § 24.2, attached as Exhibit 17 to NCB's Renewed Motion to Dismiss. It is of special significance that the plaintiffs are suing on behalf of BCCI's depositors and creditors and that, in the plaintiffs' own words, "[c]reditors who had dealings with the English branches of BCCI are greater in number and value than those who had dealings with branches in any other jurisdiction." Joint Provisional Liquidators' Report, Dec. 23, 1992, at 7, attached as Exhibit 18 to NCB's Renewed Motion to Dismiss. Strong evidence of the accuracy of this statement is the fact that the liquidators rented London's Wembley Arena, usually the site of massive rock concerts, to be the locale of a BCCI creditors' meeting on May 27, 1993. *See* Transcript, *In re Bank of Credit & Commerce International SA,* High Court of Justice (Chancery Division), Jan. 15, 1993, attached as Exhibit 23 to NCB's Renewed Motion to Dismiss, at 4, 9–10. Further indication of England's distinct interest in this dispute is the Procurement Deed which the plaintiffs allege was the charter for the illegal acquisition and disposition of BCCI shares; this Deed was drafted in England, executed in England and Luxembourg, and contained choice of law provisions incorporating the substantive law of England and Luxembourg.

In contrast to the English interest in resolution of this case, and without minimizing their loss, the only persons or entities in the United States who may benefit from this litigation are those that maintained offshore accounts with BCCI or did other foreign business with those entities. Counsel for plaintiffs conceded at oral argument that the number of such individuals and entities is negligible compared to depositors elsewhere. Statement of Michael Nussbaum, Tr. at 50 ("A large point has been made that there are few American depositors compared to depositors elsewhere. That is a point that is correct. There certainly are Americans who lost money as depositors, but there are more in England."). Plaintiffs contend that there is a large United States interest in resolution of this conflict because of their allegations that defendants committed the illegal acts in part to acquire control of First American Bank, located in the District of Columbia. While those allegations obviously give the United States and the District of Columbia an interest in the litigation of this case, that interest pales in comparison to the English interest. No matter how earnestly the plaintiffs attempt to characterize this case as one arising primarily from a motivation to illegally gain control of First American Bank, the central focus of this case, as illustrated by the complaint, is really about the worldwide collapse of BCCI at the hands of foreign defendants and the resulting damages suffered mostly by English residents and others located abroad.

With respect to the burdens of resolving the case in this forum, another public interest factor, even a cursory examination of the docket sheets and the size of the file in this case reveals the heavy onus this litigation would place on the Court. At this stage of the proceedings, over 150 pleadings, orders, and other documents have been filed. It is evident that the final resolution of the matter, including a likely appeal, would take years. Indeed, it is not unlikely that trial alone could consume weeks, if not months, and the District of Columbia's relatively minor interest in the outcome of the dispute does not justify submitting its citizens to the rigors of sitting as jurors through so lengthy a case. In terms of docket congestion, another factor which *Pain* requires this Court to examine, the number of criminal and other civil cases filed in this jurisdiction has impeded the Court's ability to resolve a significant number of civil disputes in as timely a fashion as it would like. Further complicating matters is the fact that this United States District Court presently labors with only two-thirds of the active judges allotted to it. The lengthy trial in this case would hinder this Judge's ability to fully assist in bearing the burden created by the judicial vacancies.

Nothing in the record of this case indicates similar administrative problems in the English forum.

In terms of the public interest factor relating to familiarity with governing law, certainly resolution of some counts of the complaint will necessitate inquiry into the law of England, Luxembourg, or other foreign countries, notwithstanding the fact that plaintiffs' claims are based in large part on RICO. As already noted, the Procurement Deed which is so central to plaintiffs' complaint incorporates foreign law and was drafted by foreign lawyers and executed abroad. In addition, the complaint contains a count alleging that Mahfouz breached a fiduciary duty owed to the foreign plaintiffs. Resolution of that count likely would require inquiry into the laws of the countries in which the BCCI entities were incorporated and operated.

In sum, and having given due consideration to plaintiffs' desire to litigate this matter in this jurisdiction, a balance of all relevant public interest factors strongly reveals that this action should be dismissed in favor of resolution in England.

### D. REINSTATEMENT IN AN ALTERNATIVE FORUM

The final prerequisite of a dismissal for *forum non conveniens* cited by *Pain,* the ability of plaintiffs to reinstate their suit in the alternative forum without undue inconvenience or prejudice, is not at issue in light of the fact that the English case has been filed and is presently pending.

### CONCLUSION

Upon scrutiny of all submissions and arguments of the parties and of the relevant caselaw, upon finding that England is likely to be an adequate alternate forum for the resolution of this dispute, after weighing relevant factors of private and public interest, and having taken into consideration the plaintiffs' original choice of forum, it is hereby

ORDERED that this case is dismissed, conditionally, on the ground of *forum non conveniens.* Should there be a final determination (following all appeals, if any) that the

English court cannot adjudicate the claims of the plaintiffs and/or cannot exercise jurisdiction over Sheikh Khalid bin Mahfouz, Haroon Rashid Kahlon, or National Commercial Bank, Saudi Arabia in the proceeding which correlates to this case, this Court will reconsider its dismissal of the complaint.

IT IS SO ORDERED.