United States Court of Appeals,

Eleventh Circuit.

No. 95-4979.

REPUBLIC of PANAMA, Plaintiff-Appellant,

v.

BCCI HOLDINGS (LUXEMBOURG) S.A., Bank of Credit and Commerce International, S.A., Bank of Credit and Commerce International (Overseas) Limited, Amjad Awan, First American Bank, N.A., First American Bank of New York, a New York state bank, First American Bank, a California state bank, Defendants-Appellees.

Aug. 20, 1997.

Appeal from the United States District Court for the Southern District of Florida. (No. 90-2913-CV-UUB), Ursula Ungaro-Benages, Judge.

Before BARKETT, Circuit Judge, KRAVITCH, Senior Circuit Judge, and HARRIS[*], Senior District Judge.

KRAVITCH, Senior Circuit Judge:

The Republic of Panama filed this action in the Southern District of Florida asserting claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.,* and state law claims against several American and foreign banking entities.[1] The complaint charged each of the defendants with participating in a scheme to assist former Panamanian military officer, Manuel Noriega, in illegally diverting Panamanian government funds for his personal use. The district court dismissed Panama's claims against First American Bank, N.A. and First American Bank of New York (the "First American defendants") for lack of personal jurisdiction and dismissed its claims with respect to the remaining defendants on the grounds of *forum non conveniens.*

---

[*]Honorable Stanley S. Harris, Senior U.S. District Judge for the District of Columbia, sitting by designation.

[1]Panama brought this action against appellees BCCI Holdings (Luxembourg), S.A. ("BCCI Holdings"); Bank of Credit Commerce International, S.A. ("BCCI S.A."); Bank of Credit and Commerce International (Overseas) Ltd. ("BCCI Ltd."); First American Bank, N.A. ("First American"); and First American Bank of New York. First American Bank of California, although named as a defendant, was dropped as a party by Panama in 1991. The final defendant, Amjad Awan, was a manager and officer of BCCI, Ltd. employed in its Miami office. He was convicted of multiple counts of money laundering and crimes related to BCCI's relationship with Noriega. Awan, however, has never been served in this action.

Panama appeals both rulings.

Addressing an issue that has divided district courts in this circuit, we conclude that the Due Process Clause of the Fifth Amendment provides an independent constitutional limitation on the court's exercise of personal jurisdiction over a domestic defendant served pursuant to a federal statute's nationwide service of process provision. On the facts of this case, we find no constitutional barrier to jurisdiction and therefore reverse the district court's order dismissing Panama's claims against the First American defendants for lack of personal jurisdiction. We nevertheless affirm the dismissal of these claims on the alternative ground that Panama failed to state a proper RICO claim against these defendants. We also affirm the dismissal of Panama's claims against the remaining defendants on the basis of *forum non conveniens*.

## I. Background

BCCI Holdings is the parent corporation of BCCI S.A. and BCCI Ltd. During the time period relevant to the complaint, these foreign defendants were the principal corporations in an international banking group operating in sixty-nine countries, including the United States. Collectively, they will be referred to as the "BCCI defendants" or as "BCCI." First American Bank, N.A. is an American bank with its principal place of business in the District of Columbia, and First American Bank of New York is a New York state bank with its principal place of business in New York City.

The complaint alleges that in 1981 the BCCI defendants "surreptitiously obtained control" of the First American defendants by demanding First American stock as security for loans. The complaint also alleges that the BCCI defendants actively misrepresented the nature of their control over the First American defendants and purposely concealed this ownership from federal regulators. Panama asserts that First American was the "alter ego" of BCCI and that the First American defendants were integrated into BCCI's worldwide legal and illegal banking operations with the "knowledge, agreement, and/or acquiescence" of Robert Altman. Altman served as a controlling officer of First American Bankshares, the parent company of the First American defendants, and as an officer and/or director of one of the conduit holding companies that BCCI used to control First

American Bankshares.[2]

The complaint further alleges that beginning in 1981 Manuel Noriega illegally diverted millions of dollars from the Panamanian government into secret BCCI accounts throughout the world. BCCI laundered the diverted funds, redistributed them to various accounts throughout the world, and made them available to Noriega and his family for their personal use. The BCCI defendants allegedly conducted these transfers to conceal Noriega's illegal activities from the Republic of Panama and from other lawful authorities.

From 1986 through 1987, the First American defendants allegedly assisted the BCCI defendants in transferring the money stolen by Noriega and in making these unlawful proceeds available to him and his family in this country. Specifically, BCCI routinely channeled Noriega funds through its account with First American in Washington, D.C. On one occasion in 1987, First American issued a cashier's check for $71,600 to a Miami realtor. Issued from illegal Noriega proceeds, this check allegedly was used to assist the Noriegas in acquiring property in Miami.

In July 1991, banking regulators in the United States and elsewhere closed BCCI. Six months later, the courts in the Cayman Islands, England, and Luxembourg ordered the formal liquidation of BCCI and charged liquidators in these countries with collecting and distributing BCCI's remaining assets.[3] The liquidation proceedings, which are ongoing in each of these three countries, operate according to pooling agreements by which all creditors share ratably in BCCI's limited assets.

In December 1991, the BCCI defendants pleaded guilty to criminal RICO charges in this country. Pursuant to the plea agreement, all of BCCI's assets in the United States were forfeited to

---

[2]There were a number of layers to the BCCI defendants' alleged control of the First American defendants. BCCI Ltd., acting through Robert Altman and others, established two holding companies for the purpose of acquiring control of the First American defendants. The BCCI defendants controlled a Netherlands holding corporation, which in turn controlled a Netherlands Antilles holding corporation, which in turn controlled First American Corporation, which in turn controlled First American Bankshares, the parent company of the First American defendants.

[3]Since July 1991, the BCCI defendants have appeared in this action through their court-appointed liquidators.

the U.S. government and placed in a custodial account.[4] As a result of the plea agreement and forfeiture, the BCCI defendants no longer have any assets in this country.

Panama first instituted this action in December 1990. It filed its Fourth Amended Complaint in August 1993. In May 1994, the district court granted the First American defendants' motion to dismiss for lack of personal jurisdiction and, in the alternative, ruled that Panama had failed to state a RICO claim against these defendants. In July 1995, the district court dismissed Panama's claims against the BCCI defendants on the basis of *forum non conveniens* and, in the alternative, international comity.

## II. Discussion

*A. First American Defendants' Motion to Dismiss*

Panama alleged that the district court had jurisdiction over the First American defendants under RICO's nationwide service of process provision, 18 U.S.C. § 1965(d), which provides that process may be served "on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." The district court concluded that although Panama had satisfied the requirements of this section, Panama had not alleged sufficient contacts with Florida to satisfy the Due Process Clause of the Fifth Amendment. The court therefore granted the First American defendants' motion under Fed.R.Civ.P. 12(b)(2) to dismiss Panama's claims against them for lack of personal jurisdiction. Without abandoning their attack on personal jurisdiction, the First American defendants urge us to put aside the jurisdictional issue and first review the district court's alternative ruling under Fed.R.Civ.P. 12(b)(6) addressing the merits of Panama's RICO claim.[5]

As a general rule, courts should address issues relating to personal jurisdiction before reaching the merits of a plaintiff's claims. *See Madara v. Hall,* 916 F.2d 1510, 1513-14 & n. 1 (11th

---

[4]A portion of these forfeited assets are due to be transferred to the court-appointed liquidators and paid to BCCI creditors and depositors.

[5]If defendants had consented to the exercise of personal jurisdiction, we would proceed directly to the merits of Panama's claims. *See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 703-05, 102 S.Ct. 2099, 2105, 72 L.Ed.2d 492 (1982) ("Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived.").

Cir.1990); Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure,* Civil 2d §

1351, at 243-44 (1990). A defendant that is not subject to the jurisdiction of the court cannot be

bound by its rulings. *Madara,* 916 F.2d at 1514. Thus, as a preliminary matter, courts should

determine if they have the power to bind a defendant with a ruling on the merits of the case.

Moreover, the fact that a dismissal for failure to state a claim is with prejudice whereas a dismissal

for lack of jurisdiction is without prejudice counsels against bypassing the jurisdictional issue. *See*

*Madara,* 916 F.2d at 1514 n. 1 (contrasting consequences of dismissals made under Fed. R. Civ. P.

12(b)(2) and Fed.R.Civ.P. 12(b)(6)) (citing *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 221 (2d

Cir.1963) (*en banc* )).

Although courts have held that it is permissible in some circumstances to bypass the issue

of personal jurisdiction if a decision on the merits would favor the party challenging jurisdiction and

the jurisdictional issue is difficult,[6] we decline to depart from the general rule in this case. The

jurisdictional issue presented in this appeal has perplexed and divided district courts in this circuit,

and the lack of direction from this court has produced substantial inconsistency for litigants. *See*

*BankAtlantic v. Coast to Coast Contractors, Inc.,* 947 F.Supp. 480, 488 & n. 6 (S.D.Fla.1996)

(noting lack of consensus and lack of guidance from this circuit).[7] In addition, the jurisdictional

issue in this case was addressed by the district court and was fully litigated by both parties on

appeal. The factual record thus is sufficiently developed for us to decide the jurisdictional issue

---

[6]*See, e.g., Lee v. City of Beaumont,* 12 F.3d 933, 937-38 (9th Cir.1993) (assuming existence of personal jurisdiction); *Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 40-41 (1st Cir.1991) (skipping personal jurisdiction to decide RICO claim on merits); *see also Smith v. Avino,* 91 F.3d 105, 108 (11th Cir.1996) (bypassing subject matter jurisdiction); *see generally Browning-Ferris Industries of South Jersey, Inc. v. Muszynski,* 899 F.2d 151, 154-60 (2d Cir.1990) (discussing assumption of jurisdiction).

[7]In addition to the district court in the case at bar, a number of district courts in this circuit have concluded that an independent due process analysis is required in cases involving nationwide service of process provisions and domestic corporations. *See, e.g., Willingway Hospital, Inc. v. Blue Cross & Blue Shield of* Ohio, 870 F.Supp. 1102, 1107 (S.D.Ga.1994); *Duckworth v. Medical Electro-Therapeutics, Inc.,* 768 F.Supp. 822, 830 (S.D.Ga.1991); *Cannon v. Gardner-Martin Asphalt Corp. Retirement Trust-Profit Sharing Plan,* 699 F.Supp. 265, 267-68 (M.D.Fla.1988). Several other courts have reached the opposite conclusion. *See, e.g., BankAtlantic v. Coast to Coast Contractors, Inc.,* 947 F.Supp. 480, 490 (S.D.Fla.1996); *In re Prospect Hill Resources, Inc.,* 69 B.R. 79, 80 (Bankr.N.D.Ga.1986); *Clement v. Pehar,* 575 F.Supp. 436, 438-39 (N.D.Ga.1983).

without further fact-finding. Although we recognize that here the jurisdictional issue presents difficult questions, we address this issue because it is properly before us, because it is well presented, and because it has produced conflicting rulings within our circuit.

The First American defendants nevertheless contend that we need not decide whether the Fifth Amendment Due Process Clause limits the reach of RICO's nationwide service of process provision because, having failed to state a claim under RICO, Panama should not be allowed to utilize that statute's nationwide service of process provision to establish jurisdiction over them.[8] Because defendants failed to make this argument before the district court, we need not address it on appeal. *See Narey v. Dean,* 32 F.3d 1521, 1526-27 (11th Cir.1994). We consider this claim only to clarify the distinction between what a plaintiff asserting jurisdiction under a federal statute must allege to survive a defendant's 12(b)(1) or 12(b)(2) motion on the one hand, and a defendant's 12(b)(6) motion on the other. *See IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1055-57 (2d Cir.1993) (comparing jurisdictional standards under 12(b)(1) and 12(b)(2) with 12(b)(6) standards), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994).

When a jurisdictional motion to dismiss depends, as in this case, on the assertion of a right created by a federal statute, the court should dismiss for lack of jurisdiction only if "the right claimed is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit as not to involve a federal controversy.' " *Id.* at 1055 (citations omitted); *see also Garcia v. Copenhaver, Bell & Assocs.,* 104 F.3d 1256 (11th Cir.1997) (dismissal for lack of subject matter jurisdiction is only appropriate when plaintiff's federal claim is "clearly immaterial or insubstantial"). The Second Circuit in *Herrmann* held that because plaintiffs had asserted a colorable claim under a federal statute, they were entitled to take advantage of that statute's nationwide service of process provision. 9 F.3d at 1056 (finding jurisdiction under Multi-employer

---

[8]In support, defendants cite *Combs v. Bakker,* 692 F.Supp. 596, 602 (W.D.N.C.1988) (stating that plaintiffs could not take advantage of RICO's nationwide service of process provision because complaint did "not set out facts sufficient to bring Defendants within the reach of [RICO]"), *vacated,* 886 F.2d 673 (4th Cir.1989). On appeal, the Fourth Circuit expressly declined to consider the validity of the district court's assertion that nationwide service was not available to plaintiffs in that case. *Combs v. Bakker,* 886 F.2d at 675 n. 1.

Pension Plan Amendments Act ("MPPAA")). The *Herrmann* court therefore proceeded to decide that it had personal jurisdiction over defendants under MPPAA's nationwide service of process provision before addressing defendants' motion to dismiss for failure to state a claim under that statute. *Id.* at 1057 (distinguishing between a "colorable federal claim" and a "federal claim upon which relief can be granted").

We adopt the same approach and conclude that insofar as an asserted federal claim is not wholly immaterial or insubstantial, a plaintiff is entitled to take advantage of the federal statute's nationwide service of process provision. Because the First American defendants waived their argument challenging Panama's right to utilize RICO's nationwide service of process provision, we need not decide whether Panama has stated a colorable RICO claim.[9] Instead, we must decide whether Panama properly has established under this provision the district court's jurisdiction over the First American defendants.

*1. Personal Jurisdiction*

In analyzing a motion to dismiss for lack of personal jurisdiction under Fed.R.Civ.P. 12(b)(2), we first determine whether the applicable statute potentially confers jurisdiction over the defendant, and then determine whether the exercise of jurisdiction comports with due process. *Sun Bank, N.A., v. E.F. Hutton & Co., Inc.,* 926 F.2d 1030, 1033 (11th Cir.1991) (diversity case); *Go-Video, Inc. v. Akai Elec. Co., Ltd.,* 885 F.2d 1406, 1413 (9th Cir.1989) (federal question case).

In this case, we need not pause long over the first question. Section 1965(d) of the RICO statute provides for service in any judicial district in which the defendant is found. When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction. *In re Chase & Sanborn Corp.,* 835 F.2d 1341, 1344 (11th Cir.1988), *rev'd on other grounds sub. nom, Granfiancieria, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989); *see also Lisak v. Mercantile Bancorp, Inc.,* 834 F.2d 668, 671 (7th Cir.1987) (noting that

---

[9]Were we forced to decide this issue, we would conclude, for reasons discussed *infra,* that Panama's RICO claim is not "so insubstantial, implausible, or otherwise completely devoid of merit" as to deprive Panama of the right to utilize RICO's nationwide service of process provision.

section 1965 "creates personal jurisdiction by authorizing service"), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 700 (1988). Because the First American defendants are domestic corporations doing business in this country, the statutory basis for personal jurisdiction over these defendants is satisfied.

The constitutional question is considerably more involved. It is well established that when, as here, a federal statute provides the basis for jurisdiction, the constitutional limits of due process derive from the Fifth, rather than the Fourteenth, Amendment. *Chase & Sanborn,* 835 F.2d 1341, 1344 (11th Cir.1988) ("The due process clause of the fifth amendment constrains a federal court's power to acquire personal jurisdiction via nationwide service of process."). There is considerable debate, however, over the scope of the limits imposed by the Fifth Amendment when jurisdiction is established over a domestic defendant via a nationwide service of process provision. Appellant urges us to adopt a "pure national contacts" approach. It asserts that the Fifth Amendment requires only that the defendant have "minimum contacts" with the United States as a whole. The First American appellees, on the other hand, contend that the "minimum contacts" inquiry is the same under the Fifth Amendment as it is under the Fourteenth Amendment. They therefore insist that under the Fifth Amendment courts must also focus on a defendant's contacts with the forum state rather than with the nation as a whole. The district court adopted yet a third approach—a "flexible minimum contacts" analysis that evaluates a defendant's contacts with the forum, but in a less demanding fashion than is required by the Fourteenth Amendment.

### a. The Relevance of Jim Walter

In order to evaluate these contentions, we begin with this court's opinion in *Federal Trade Comm'n v. Jim Walter Corp.,* 651 F.2d 251 (5th Cir. Unit A Jul.1981).[10] In assessing the Fifth Amendment's constraints on the use of a federal statute's nationwide service of process provision, the court in *Jim Walter* concluded that "due process requires only that a defendant in a federal suit have minimum contacts with the United States." *Id.* at 256. Because the defendant was a "resident

---

[10]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc* ), we adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

United States corporation," the court found that it "necessarily ha[d] sufficient contacts with the United States to satisfy the requirements of due process." *Id.* We rejected the notion that once minimum contacts had been established with the United States, fairness or convenience had any relevance in determining whether the court could constitutionally exercise jurisdiction over a particular defendant. *Id.* at 257.

In *Jim Walter,* we "grounded our holding on the understanding that "[t]he doctrine [of personal jurisdiction] arises out of the limitations inherent in the concepts of sovereignty.' " *Busch v. Buchman, Buchman & O'Brien,* 11 F.3d 1255, 1257 (5th Cir.1994) (quoting *Jim Walter,* 651 F.2d at 256). We found the doctrine's "application to federal jurisdiction ... unambiguous" because we concluded that personal jurisdiction is "[p]roperly understood as defining the limits on the exercise of the sovereign function." *Jim Walter,* 651 F.2d at 256-57 ("When minimum contacts exist with the relevant sovereign, due process no longer protects a defendant from distant litigation because the location of permissible venues is a matter of sovereign prerogative.").

The rationale of our holding in *Jim Walter,* however, subsequently was rejected by the Supreme Court in *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702-03, 102 S.Ct. 2099, 2104-05, 72 L.Ed.2d 492 (1982), in which it clarified the constitutional underpinnings of personal jurisdiction.[11] Justice White, writing for eight members of the Court, explained that "[t]he personal jurisdiction requirement recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." 456 U.S. at 702, 102 S.Ct. at 2104-05;[12] *see also Pardazi v. Cullman Medical Center,* 896 F.2d 1313, 1317 (11th Cir.1990) ("Unlike the rules of subject matter jurisdiction, the rules of personal jurisdiction protect an individual's rights, not a sovereign's rights.") (citing

---

[11]In *Bauxites,* the Court held that a district court could, as a sanction under Fed.R.Civ.P. 37(b)(2)(A), establish facts forming the basis for personal jurisdiction over a recalcitrant party. 456 U.S. at 709-11, 102 S.Ct. at 2108.

[12]Because *Bauxites* involved a state-law diversity claim, the Fourteenth Amendment provided the applicable due process limits in that case. The Court's discussion of the constitutional foundations of personal jurisdiction, however, is phrased in broad terms; it nowhere suggests that its articulation of due process principles is inapplicable to the Due Process Clause of the Fifth Amendment.

*Bauxites, 456 U.S. at 704,* 102 S.Ct. at 2104-05).

Regardless of whether this passage in *Bauxites* marked a fundamental change in the Supreme Court's personal jurisdiction jurisprudence, it unquestionably undermined the rationale and precedential effect of *Jim Walter*.[13] In *Chase & Sanborn,* we indicated that the question previously answered by *Jim Walter* was unsettled in this circuit. 835 F.2d 1341, 1344-45 n. 8 (11th Cir.1988) ("We note, without deciding the issue, that there is a lack of consensus among the courts as to whether a due process analysis is necessary where the defendant is a domestic corporation served via nationwide service of process.").[14]

Similarly, the Fifth Circuit recently determined that the Supreme Court had "rejected [*Jim Walter* 's] sovereignty analysis" in *Bauxites. Busch,* 11 F.3d at 1257. As a result, the Fifth Circuit concluded that it was necessary to revisit the constitutional question posed in *Jim Walter* and apply the due process standards articulated by the Court in *Bauxites. Id.* (nevertheless affirming the result reached in *Jim Walter* ). Like the Fifth Circuit, we conclude that *Bauxites* requires us to revisit the issue presented in *Jim Walter* and to determine anew what limits the Due Process Clause of the Fifth Amendment provides in the context of nationwide service of process.

### b. Due Process under the Fourteenth Amendment

Although the Supreme Court has never addressed the scope of due process protection under the Fifth Amendment in the jurisdictional context,[15] it often has discussed the due process

---

[13]Several courts have concluded that *Bauxites* did not fundamentally alter the Court's approach to jurisdiction. *See, e.g., Go-Video, Inc. v. Akai Electric Co., Ltd.,* 885 F.2d 1406, 1416 (9th Cir.1989) ("The quoted passage serves merely to introduce the discussion of the waivability of certain objections to personal jurisdiction."); *Steinberg & Lyman v. Takacs,* 690 F.Supp. 263, 265-66 (S.D.N.Y.1988) (rejecting argument that "*Bauxites* has worked a fundamental change in the law of personal jurisdiction").

[14]Several district courts in this circuit have also concluded that, as a result of *Bauxites, Jim Walter* is no longer binding precedent. *See, e.g., Willingway Hospital,* 870 F.Supp. at 1105 ("In light of [*Bauxites* ], this Court does not feel constrained by the holding of *Jim Walter.*"); *Cannon,* 699 F.Supp. at 267 (finding that *Jim Walter* is of "dubious precedential value" and refusing to follow it).

[15]On two occasions, the Supreme Court has noted that the question of whether the Due Process Clause of the Fifth Amendment could be satisfied solely by reference to a defendant's contacts with the nation as a whole was not properly before it. *See Omni Capital Int'l v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 102 n.5, 108 S.Ct. 404, 409 n.5, 98 L.Ed.2d 415 (1987); *Asahi*

protections afforded by the Fourteenth Amendment. Because the language and motivating policies of the due process clauses of these two amendments are substantially similar, opinions interpreting the Fourteenth Amendment due process provide important guidance for us in determining what due process requires in cases involving nationwide service of process. *See Chase & Sanborn,* 835 F.2d at 1345 ("We look to *International Shoe v. Washington* and its progeny [ (Fourteenth Amendment cases) ] for guidance in determining whether due process is satisfied [under the Fifth Amendment].") (citation omitted).

In articulating the due process limits of the Fourteenth Amendment, the Supreme Court frequently has returned to the seminal case of *International Shoe Co. v. Washington,* in which it stated that due process requires that "the maintenance of the suit ... not offend "traditional notions of fair play and substantial justice.' " 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (citation omitted). In its more recent opinions, the Court has clarified the meaning of this familiar phrase and increasingly emphasized that due process protects individual liberty interests by protecting parties from the unreasonable demands of litigating in a faraway forum.

In *World-Wide Volkswagen v. Woodson,* 444 U.S. 286, 291-92, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980), the Court described the *International Shoe* test as performing "two related, but distinguishable, functions." First, due process under the Fourteenth Amendment acts as "the guarantor against inconvenient litigation" by "protect[ing] the defendant against the burdens of litigating in a distant or inconvenient forum." *Id.* at 292, 100 S.Ct. at 564-65 (describing protection in terms of "reasonableness" and "fairness"). Second, due process acts to ensure that states do not reach out beyond the limits imposed on them as coequal sovereigns in a federal system. *Id.* at 291-92, 100 S.Ct. at 564.

Two years later, in *Bauxites,* the Court clarified the relation between these two functions by suggesting that due process serves primarily to protect individual liberty. 456 U.S. at 702-03, 102 S.Ct. at 2104-05 (noting that "the requirement of personal jurisdiction represents first of all an

<hr/>

*Metal Industry v. Superior Court of California*, 480 U.S. 102, 113 n.\*, 107 S.Ct. 1026, 1032 n.\*, 94 L.Ed.2d 92 (1987)(plurality opinion).

individual right"). The restriction on sovereign power described in *World-Wide Volkswagen* therefore "must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause." *Id.* 456 U.S. at 702-03 & n. 10, 102 S.Ct. at 2104-05 & n. 10.

The Court again revisited the limits of due process and the relation of sovereignty to individual liberty in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The Court reasoned that the limits on state power under the Fourteenth Amendment are designed to protect individuals by providing them with fair notice that their activities will render them liable to suit in a particular forum. *Id.* 471 U.S. at 470-77, 105 S.Ct. at 2181-84. "[T]his "fair warning' requirement is satisfied if the defendant has "purposefully directed' his activities at residents of the forum." *Id.* 471 U.S. at 472, 105 S.Ct. at 2182 (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984)).[16] Activities purposefully directed within a forum justify a sovereign's exercise of power in requiring an individual to litigate within its borders.

The Court noted, however, that demonstrating "purposeful availment" does not, by itself, satisfy the demands of due process. Once it has been established that a defendant has purposefully directed his activities at a particular forum, courts still should determine if the "the assertion of personal jurisdiction would comport with "fair play and substantial justice.' " *Id.* 465 U.S. at 776, 104 S.Ct. at 2184 (quoting *International Shoe*, 326 U.S. at 320, 66 S.Ct. at 160). Justice Brennan cautioned that "minimum requirements inherent in the concept of "fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities." *Id.*, 326 U.S. at 477-78, 66 S.Ct. at 2185; *see also Madara v. Hall,* 916 F.2d 1510, 1517 (11th Cir.1990) (after purposeful availment has been established, court must examine fairness of requiring defendant to litigate in plaintiff's chosen forum).

### c. Fairness under the Fifth Amendment

---

[16]Because the relevant forum under the Fifth Amendment is the United States, this "purposeful availment" prong of due process will have no application in the case of domestic defendants, who, through their choice of residence or incorporation, have purposefully directed their activities at the United States.

We discern no reason why these constitutional notions of "fairness" and "reasonableness," *see World-Wide Volkswagen*, 444 U.S. at 291-92, 100 S.Ct. at 564, should be discarded completely when jurisdiction is asserted under a federal statute rather than a state long-arm statute. The language of the Fifth Amendment is virtually identical to that of the Fourteenth Amendment,[17] and both amendments were designed to protect individual liberties from the same types of government infringement. *See Mathews v. Eldridge,* 424 U.S. 319, 331-32, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976) (relying on Fourteenth Amendment cases to define limits of the Fifth Amendment's procedural due process protections). Although the fact that the United States is the sovereign asserting its power undoubtedly must affect the way the constitutional balance is struck, the assertion of federal power should not cause courts to abandon completely their role as protectors of individual liberty and fundamental fairness.[18]

Accordingly, several circuits have concluded that the Fifth Amendment, like the Fourteenth Amendment, protects individual litigants against the burdens of litigation in an unduly inconvenient forum. *See, e.g., Chase & Sanborn,* 835 F.2d at 1345 (indicating that Fifth Amendment inquiry focuses on "fairness and reasonableness" of requiring defendant to litigate in particular forum);[19] *Handley v. Indiana & Michigan Electric Co.,* 732 F.2d 1265, 1272 (6th Cir.1984) ("In a case like

---

[17]*Compare* U.S. Const. amend. V ("No person shall be ... deprived of life, liberty, or property without due process of law ....") *with* U.S. Const. amend. XIV § 1 ("No state shall ... deprive any person of life, liberty or property, without due process of law....").

[18]Several commentators have concluded that federal nationwide service of process should not eliminate completely the fairness limitations of the Fifth Amendment. *See, e.g.,* Maryellen Fullerton, *Constitutional Limits on Nationwide Personal* Jurisdiction in the Federal Courts, 79 Nw. U.L.Rev. 1, 38 (1984) ("The due process clause of the fifth amendment should be interpreted to limit the exercise of personal jurisdiction over defendants for whom the place of trial is unreasonably burdensome."); Robert A. Lusardi, *Nationwide Service of Process: Due Process Limitations on the Power of the Sovereign,* 33 Vill. L.Rev. 1, 32-38 (1988) (concluding that nationwide service of process "should still be limited by a due process requirement of fairness to the defendant"); Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure,* § 1067.1, at 325 (1987) ("The better view ... would require that the national contacts test be supplemented by some assurances that the particular choice of forum will be one that is fair to the defendant.").

[19]*Chase & Sanborn* involved the use of nationwide service of process to assert jurisdiction over an alien defendant. In that case, we declined to decide whether, in determining the constitutional fairness of the forum, we should look to the defendant's contacts with the forum or to its aggregate contacts with the United States. *Chase & Sanborn,* 835 F.2d at 1345 n. 10.

the present one, where the federal court is sitting in a federal question case, the purpose of minimum contacts is to protect the defendant "against the burdens of litigating in a distant or inconvenient forum.' ") (quoting *World-Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. at 564); *Horne v. Adolph Coors Co.,* 684 F.2d 255, 259 (3d Cir.1982) ("The only constitutional limitation on Congressional power to provide a forum is whatever fairness is required by fifth amendment due process."); *Lone Star Package Car Co. v. Baltimore & O.R. Co.,* 212 F.2d 147, 155 (5th Cir.1954) (when "cases are governed by federal law, the question of whether they are to be tried in one locality or another is now to be tested ... by basic principles of fairness").[20]

In order to evaluate whether the Fifth Amendment requirements of fairness and reasonableness have been satisfied, courts should balance the burdens imposed on the individual defendant against the federal interest involved in the litigation. *See Asahi*, 480 U.S. at 114, 107 S.Ct. at 1033 (reasonableness depends on burden to defendant, interest of sovereign, and plaintiff's interest in obtaining relief); *World-Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. at 564 (noting that the burden on the defendant, "while always a primary concern, will ... be considered in light of other relevant factors"). As in other due process inquiries, the balancing seeks to determine if the infringement on individual liberty has been justified sufficiently by reference to important governmental interests.

We note, however, that courts must engage in this balancing only if a defendant has established that his liberty interests actually have been infringed. *See* Fullerton, *supra,* at 40 ("While distant litigation often is more bothersome than litigation at home, inconvenience that is not substantial should be ignored for constitutional purposes."). Only when a defendant challenging jurisdiction has "present[ed] a compelling case that ... would render jurisdiction unreasonable," *see Burger King*, 471 U.S. at 477, 105 S.Ct. at 2185, should courts weigh the federal interests favoring the exercise of jurisdiction.

_____

[20]*But see Stafford v. Briggs,* 444 U.S. 527, 552-54, 100 S.Ct. 774, 789, 63 L.Ed.2d 1 (1980) (Stewart, J., dissenting) (joined by Justice Brennan) ("Due process requires only certain minimum contacts between the defendant and the sovereign that has created the court. The issue is not whether it is unfair to require a defendant to assume the burden of litigating in an inconvenient forum....").

In determining whether the defendant has met his burden of establishing constitutionally significant inconvenience, courts should consider the factors used in determining fairness under the Fourteenth Amendment. Courts should not, however, apply these factors mechanically in cases involving federal statutes. As we noted in *Chase & Sanborn,* "[t]he due process concerns of the fifth and fourteenth amendments are not precisely parallel." 835 F.2d at 1345 n. 9.

For example, a defendant's contacts with the forum state play no magical role in the Fifth Amendment analysis. "As a practical matter ... state lines cannot provide an accurate measure of the burdens that would be imposed on a defendant by requiring him to defend an action in a particular forum. There is nothing inherently burdensome about crossing a state line." Wright & Miller, *supra,* § 1067.1 at 327. Thus, determining whether litigation imposes an undue burden on a litigant cannot be determined by evaluating only a defendant's contacts with the forum state.[21] A court must therefore examine a defendant's aggregate contacts with the nation as a whole rather than his contacts with the forum state in conducting the Fifth Amendment analysis. *See United States Securities and Exchange Comm'n v. Carrillo,* 115 F.3d 1540, 1543-44 (11th Cir.1997).[22]

A defendant's "minimum contacts" with the United States do not, however, automatically satisfy the due process requirements of the Fifth Amendment.[23] There are circumstances, although

---

[21]As discussed *supra,* contacts with the forum state—the relevant sovereign—are relevant under the Fourteenth Amendment primarily to justify the sovereign's exercise of power in asserting jurisdiction. *See Burger King*, 471 U.S. at 470-77, 105 S.Ct. at 2181-84. Because minimum contacts with the United States—the relevant sovereign—satisfy the "purposeful availment" prong in federal question cases, contacts with the forum state are not constitutionally required.

[22]*See also In re Application to Enforce Administrative Subpoenas Duces Tecum of the Securities and Exchange Commission v. Knowles,* 87 F.3d 413, 417 (10th Cir.1996); *Busch,* 11 F.3d at 1257-58; *United Liberty Life Ins. Co. v. Ryan,* 985 F.2d 1320, 1330 (6th Cir.1993); *United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1085-86 & n. 6 (1st Cir.1992); *Go-Video, Inc. v. Akai Electric Co., Ltd.,* 885 F.2d 1406, 1415-16 (9th Cir.1989); *Lisak v. Mercantile Bancorp, Inc.,* 834 F.2d 668, 671 (7th Cir.1987), *cert. denied,* 108 S.Ct. 1472 (1988). *But see Dakota Industries Inc. v. Dakota Sportswear Inc.,* 946 F.2d 1384, 1388 n. 2 (8th Cir.1991) (stating that the Fifth Amendment requires an examination of contacts with forum rather than the United States as a whole).

[23]At this point, we depart from the reasoning and holdings of the majority of our sister circuits. *See, e.g., Busch,* 11 F.3d at 1258 (due process satisfied when defendant resides within the United States); *Go-Video,* 885 F.2d at 1416 ("minimum contacts" with the United States satisfies due process); *Lisak,* 834 F.2d at 671 ("[T]here is no constitutional obstacle to

rare, in which a defendant may have sufficient contacts with the United States as a whole but still will be unduly burdened by the assertion of jurisdiction in a faraway and inconvenient forum.[24] As the Court noted in *Burger King,* "minimum requirements inherent in the concept of "fair play and substantial justice' may defeat the reasonableness of jurisdiction even if the defendant has purposely engaged in forum activities." 471 U.S. at 477-78, 105 S.Ct. at 2185; *see also Carrillo,* 115 F.3d at 1547 (examining Fifth Amendment fairness requirement after establishing that alien defendant had sufficient minimum contacts with United States); *Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1551 (11th Cir.1993) (even though an alien defendant has purposely directed activities at the United States, Fifth Amendment requires that litigation in this country comport with traditional notions of fair play and substantial justice). Therefore, even when a defendant resides within the United States, courts must ensure that requiring a defendant to litigate in plaintiff's chosen forum is not unconstitutionally burdensome.[25]

We emphasize that it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern. *See Asahi*, 480 U.S. at 116, 107 S.Ct. at 1034 (Brennan, J., concurring in part and concurring in the judgment) (noting that only in "rare cases" will inconvenience become

---

nationwide service of process in the federal courts in federal question cases."). *But see Busch,* 11 F.3d at 1259 (Garza, J., dissenting) ("Because the personal jurisdiction requirement is a function of the individual liberty interest, the proper focus for a personal jurisdiction test should be on protecting an individual's liberty interest in avoiding the burdens of litigating in a distant or inconvenient forum. Requiring that the defendant in a national service of process case only reside somewhere in the United States does not protect this interest.") (footnotes omitted); *see also Bellaire General Hospital v. Blue Cross Blue Shield of Michigan,* 97 F.3d 822, 825 (5th Cir.1996) (expressing disagreement with *Busch* ).

[24]*See* Fullerton, *supra,* at 76-80 (discussing circumstances in which burdens of defending federal question case would be constitutionally significant); Wright & Miller, *supra,* § 1067.1 at 328-29 ("If due process is to have any application at all in federal cases—and the Fifth Amendment requires that it does—it seems impossible that Congress could empower a plaintiff to force a defendant to litigate any claim, no matter how trifling, in whatever forum the plaintiff chooses, regardless of the burden on the defendant.").

[25]We note that inconvenience "most frequently can be accommodated through a change of venue." *Burger King*, 471 U.S. at 484, 105 S.Ct. at 2188. Alternative methods of addressing inconvenience do not, however, do away with the need for a constitutional floor to protect litigants against truly undue burdens. "[I]nconvenience may at some point become so substantial as to achieve constitutional magnitude." *Id.* at 484, 105 S.Ct. at 2188. Moreover, jurisdictional defects, unlike other procedural errors, can be attacked collaterally without having to defend initially the lawsuit in the inconvenient forum. *See* Fullerton, *supra,* at 36.

constitutionally unreasonable). As we observed in *Chase & Sanborn,* "[m]odern means of communication and transportation have lessened the burden of defending a lawsuit in a distant forum." 835 F.2d at 1346; *see also World-Wide Volkswagen*, 444 U.S. at 292-93, 100 S.Ct. at 565 (noting that due process protections against inconvenient litigation have been substantially relaxed). The burden is on the defendant to demonstrate that the assertion of jurisdiction in the forum will "make litigation "so gravely difficult and inconvenient' that [he] unfairly is at a "severe disadvantage' in comparison to his opponent." *Burger King*, 471 U.S. at 478, 105 S.Ct. at 2185 (citations omitted).

When a defendant makes a showing of constitutionally significant inconvenience, jurisdiction will comport with due process only if the federal interest in litigating the dispute in the chosen forum outweighs the burden imposed on the defendant. In evaluating the federal interest, courts should examine the federal policies advanced by the statute, the relationship between nationwide service of process and the advancement of these policies, the connection between the exercise of jurisdiction in the chosen forum and the plaintiff's vindication of his federal right, and concerns of judicial efficiency and economy. Where, as here, Congress has provided for nationwide service of process, courts should presume that nationwide personal jurisdiction is necessary to further congressional objectives.

### d. Applying the Fifth Amendment Standards

Applying these standards in this case, we find no constitutional impediment to jurisdiction. First, we note that the First American defendants are large corporations providing banking services to customers in major metropolitan areas along the eastern seaboard. The fact that they may not have had significant contacts with Florida is insufficient to render Florida an unreasonably inconvenient forum. In addition, the fact that discovery for this litigation would be conducted throughout the world suggests that Florida is not significantly more inconvenient than other districts in this country. The First American defendants have presented no evidence that their ability to defend this lawsuit will be compromised significantly if they are required to litigate in Miami. In short, the First American defendants have failed to present a "compelling case" that litigating this action in the chosen forum will put them at a "severe disadvantage." *See Burger King*, 471 U.S. at

478, 105 S.Ct. at 2185.

Because we conclude that the First American defendants have not demonstrated any constitutionally significant inconvenience, we find no infringement of their individual liberty interests protected by the Due Process Clause of the Fifth Amendment. Therefore, we need not balance the federal interests at stake in this lawsuit. We hold that the district court erred in dismissing Panama's claims against the First American defendants for lack of personal jurisdiction.

*2. 12(b)(6) Motion*

Because we have determined that the court did in fact have the authority to issue a binding judgment against the First American defendants, we will examine the district court's alternative ruling dismissing the Panama's RICO claims for failure to state a claim. *See Combs v. Bakker,* 886 F.2d 673, 675 (4th Cir.1989) (after concluding that district court's jurisdictional dismissal had been made in error, it was proper to review district court's ruling on defendants' 12(b)(6) motion). We review the district court's ruling *de novo,* accepting as true all of the facts alleged in the fourth amended complaint. *See Williams v. Cordis Corp.,* 30 F.3d 1429, 1430 (11th Cir.1994).

RICO makes it unlawful "to conduct or participate, directly or indirectly, in the conduct of [an] enterprise [that affects interstate commerce] through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The "pattern of racketeering activity" element requires that a civil RICO plaintiff establish "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). Congress has defined "racketeering activity" to mean the violation of any of the criminal statutes listed in § 1961(1).

Section 1961 requires that a RICO plaintiff establish that a defendant could be convicted for violating any of its predicate statutes. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 486-88, 105 S.Ct. 3275, 3280, 87 L.Ed.2d 346 (1985); 18 U.S.C. § 1961 (defining racketeering activity to include conduct that is "chargeable" or "indictable" and "offenses" that are "punishable" under various criminal statutes). Therefore, in order to survive a motion to dismiss, a plaintiff must allege facts sufficient to support each of the statutory elements for at least two of the pleaded predicate acts. *See Central Distributors of Beer, Inc. v. Conn,* 5 F.3d 181, 183-84 (6th Cir.1993) (affirming grant of summary judgment), *cert. denied,* 512 U.S. 1207, 114 S.Ct. 2678, 129 L.Ed.2d 812 (1994).

The First American defendants argue that Panama's RICO claim against them must fail because it does not allege the required element of scienter for any of the predicate acts alleged in the fourth amended complaint.

Panama alleges that the First American defendants committed the following predicate acts: wire fraud in violation of 18 U.S.C. § 1343; transportation in interstate or foreign stolen commerce in violation of 18 U.S.C. § 2314; money laundering in violation of 18 U.S.C. § 1956; and engaging in monetary transactions in property derived from unlawful activity in violation of 18 U.S.C. § 1957. Each of these statutes requires proof of scienter. *See Pelletier v. Zweifel,* 921 F.2d 1465, 1498 (11th Cir.) (section 1343 requires intent to defraud), *cert. denied,* 502 U.S. 855, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991); *United States v. Awan,* 966 F.2d 1415, 1424 (11th Cir.1992) (section 1956 requires that the defendant "knew that the proceeds stemmed from felonious activity"); *United States v. Baker,* 19 F.3d 605, 614 (11th Cir.1994) (section 1957 "requires that the defendant know that the property is "criminally derived' "); *United States v. Montminy,* 936 F.2d 626, 627 (1st Cir.1991) (section 2314 requires that "the defendant knew that property was converted or taken by fraud at the time of the transport").

In order to survive the motion to dismiss, Panama thus must allege either that the First American defendants had fraudulent intent when committing the banking transactions outlined in the complaint or, at a minimum, knew that the money involved in these transactions derived from unlawful activity. After carefully reviewing the specific allegations of Panama's fourth amended complaint, we conclude that Panama has failed to carry this burden.

The fourth amended complaint does not allege that the First American defendants knew that the money transferred to BCCI's First American account in Washington, D.C. was unlawfully diverted from the Panamanian government or otherwise derived from criminal activity. Panama's conclusory allegation that the BCCI defendants acted "in concert with the First American defendants" in conducting their illegal banking activities is insufficient to establish the requisite intent. A RICO plaintiff's allegations of scienter cannot be "merely conclusory and unsupported by any factual allegations." *O'Malley v. O'Neill,* 887 F.2d 1557, 1560 (11th Cir.1989) (dismissing

RICO conspiracy claim), *cert. denied,* 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990); *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987) (RICO plaintiffs must "provide some factual basis for conclusory allegations of intent"), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

Moreover, Panama's factual allegations do not "give rise to a "strong inference' that [these] defendants possessed the requisite factual intent." *See Beck,* 820 F.2d at 50. In paragraph 58 of its complaint, Panama refers to several banking transactions conducted by the First American defendants from 1986 through 1987. These factual allegations fail to suggest that the First American defendants were ever aware of the source or ultimate beneficiary of the funds transferred during this period.

Specifically, Panama alleges that in June 1986 BCCI transferred $20,000 belonging to Noriega into BCCI's account at First American in Washington, D.C. Although Panama claims that BCCI's Washington, D.C. office recorded these funds as "[p]ayments for our overseas customer, Mr. Noriega," Panama fails to allege that this documentation, or any other document referring to Mr. Noriega, was ever sent to the First American defendants. Panama also alleges that in May 1987 First American issued a cashier's check for $71,600 from BCCI's account to a Miami realtor. Although Panama claims that the proceeds of the check were used to assist the Noriegas in acquiring property in Miami, the complaint never alleges that the First American defendants knew of either the source of these funds or their ultimate beneficiary.

The remainder of paragraph 58 merely describes routine banking transactions that do not support an inference that the First American defendants possessed the requisite intent. Although Panama identifies numerous wire transfers to and from BCCI's First American account, these transactions do not provide us with a sufficient basis to infer that the First American defendants knew, or had any reason to suspect, that Manuel Noriega was the source and ultimate beneficiary of the funds transferred. *See In re Chase & Sanborn Corp.,* 848 F.2d 1196, 1201-02 (11th Cir.1988) (stating that it would impose an unfair burden on banks to hold them responsible for the source of wired funds); *In re Colombian Coffee Co., Inc.,* 75 B.R. 177, 179 (S.D.Fla.1987) (noting that it is

not reasonable to assume that banks are aware of sources of wire transfers).

Likewise, Panama's allegations regarding BCCI's secret control of the First American defendants do not allow us to infer the requisite scienter. Panama alleges that First American was the "alter ego" of BCCI and that Robert Altman, who was the controlling officer of the First American defendant's parent company, "knew or should have known that First American was illegally controlled by" BCCI. It further alleges that First American participated in BCCI's illegal international activities "with the knowledge, consent, and/or acquiescence of Altman in his capacity as its controlling officer."

Although the complaint states that Altman knew of BCCI's "secret control" of the First American defendants, it nowhere alleges that, at the time the relevant transactions occurred, Altman knew that the funds transferred to and from BCCI's First American account were derived from unlawful activity. Rather, the complaint suggests that Altman was not fully informed of BCCI's money laundering operation involving Noriega until he attended a meeting in Miami in 1988, more than one year after the transfers involving the First American defendants had been completed. There are simply no allegations that, at the time the Noriega funds were transferred in and out of First American accounts, any representative of the First American defendants knew that these funds belonged to Mr. Noriega or were otherwise wrongfully obtained.

Similarly, Panama does not allege, or provide us with sufficient facts to infer, the agreement between BCCI and the First American defendants necessary to support their RICO conspiracy claim under § 1962(d) of the RICO statute. Section 1962(d) makes it unlawful to conspire to violate any of the substantive provisions of RICO, including § 1962(c). A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts. *United States v. Church,* 955 F.2d 688, 694 (11th Cir.) (internal quotations and citations omitted), *cert. denied,* 506 U.S. 881, 113 S.Ct. 233, 121 L.Ed.2d 169 (1992); *United States v. Kopituk,* 690 F.2d 1289, 1323 (11th Cir.1982) (noting that it is sufficient that defendant knows of the "essential nature of the plan") (citations omitted), *cert. denied,* 461 U.S. 928, 103 S.Ct. 2089, 77

L.Ed.2d 300 (1983).

The RICO agreement need not be established by direct evidence; it may be inferred from the conduct of the participants. *Church,* 955 F.2d at 695. We find no facts in the complaint, however, that allow us to infer either an agreement to engage in the scheme to assist Noriega in the illegal diversion of funds from Panama or an agreement to commit two of the predicate acts discussed above. *See O'Malley v. O'Neill,* 887 F.2d 1557, 1559 (11th Cir.1989) (upholding dismissal of RICO conspiracy claim because "no facts [were] alleged that would indicate that [defendants] were willing participants in a conspiracy"), *cert. denied,* 496 U.S. 926, 110 S.Ct. 2620 (1991); *Davidson v. Wilson,* 763 F.Supp. 1470, 1472 n. 8 (D.Minn.1991) (alleging mere affiliation between corporate defendants is insufficient to establish agreement under § 1962(d)), *aff'd,* 973 F.2d 1391 (8th Cir.1992). Without claiming that the First American defendants were aware of the "essential nature of the plan"—*i.e.,* the source or beneficiary of the funds they transferred—Panama has not properly alleged that the First American defendants knowingly agreed to participate in the RICO conspiracy.

Because we find the facts pleaded in the fourth amended complaint insufficient to support either the § 1962(c) or § 1962(d) charges, we affirm the dismissal of Panama's RICO claims against the First American defendants.[26]

## B. BCCI Defendants' Motion to Dismiss

After dismissing Panama's claims against the First American defendants, the district court dismissed its claims against the BCCI defendants on the basis of *forum non conveniens* and, alternatively, under the doctrine of international comity. We review a dismissal on the grounds of *forum non conveniens* for abuse of discretion. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 257, 266, 70 L.Ed.2d 419 (1981) ("The *forum non conveniens* determination is committed to the sound discretion of the trial court. It may be reversed only when there has been a clear abuse

---

[26]After dismissing Panama's federal claims against the First American defendants, the district court correctly dismissed its remaining state law claims against these defendants. *See Roper v. Edwards,* 815 F.2d 1474, 1477 (11th Cir.1987) (affirming dismissal of state law claims once federal grounds for keeping defendant in federal court had been dismissed).

of discretion; where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference.").

A party moving to dismiss on the basis of *forum non conveniens* must demonstrate: (1) that an adequate alternative forum is available; and (2) that the private and public interest factors weigh in favor of dismissal. *See Magnin v. Teledyne Continental Motors,* 91 F.3d 1424, 1429 (11th Cir.1996); *Lockman Foundation v. Evangelical Alliance Mission,* 930 F.2d 764, 767 (9th Cir.1991). After carefully reviewing the record, we conclude that the district court did not abuse its discretion in concluding that the BCCI defendants had established both of the necessary prongs of the *forum non conveniens* analysis.[27]

### 1. Available and Adequate Forum

Panama asserts that the district court abused its discretion in finding that the court-ordered liquidation proceedings underway in the Cayman Islands, England, and Luxembourg are adequate alternative fora. Generally, a defendant satisfies the first prong of the analysis by showing that it is " 'amenable to process' in the other jurisdiction." *Piper*, 454 U.S. at 254 n.22, 102 S.Ct. at 265 n. 22 (quoting *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947)). "In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied." *Id.* Because Panama has never contested the BCCI defendants' assertion that they are amenable to process in the liquidation proceedings, we may reverse the district court's initial determination only if we conclude that these liquidation proceedings are clearly unsatisfactory.

Panama contends that the liquidation proceedings are plainly inadequate because they will not entertain Panama's RICO claims. In *Piper Aircraft,* the Supreme Court explicitly rejected the contention that dismissal should be barred "solely because of the possibility of an unfavorable change in law." 454 U.S. at 249, 102 S.Ct. at 262. Only when "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, [will] the

---

[27]Because we find that the *forum non conveniens* dismissal was proper, we need not address the district court's alternative dismissal on the basis of international comity.

unfavorable change in law ... be given substantial weight." *Id., 454 U.S. at 254 n.22,* 102 S.Ct. at 265 & n. 22 ("Thus, for example, dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute.").

Accordingly, the three circuits that have considered this issue have concluded that a plaintiff's inability to assert a RICO claim in the foreign forum does not preclude *forum non conveniens* dismissal. *See, e.g., Lockman Foundation v. Evangelical Alliance Mission,* 930 F.2d 764, 769 (9th Cir.1991); *Kempe v. Ocean Drilling & Exploration Co.,* 876 F.2d 1138, 1143-44 (5th Cir.), *cert. denied,* 493 U.S. 918, 110 S.Ct. 279, 107 L.Ed.2d 259 (1989); *Transunion Corp. v. PepsiCo, Inc.,* 811 F.2d 127, 129 (2d Cir.1987) (per curiam). We are persuaded by these holdings. Therefore, the adequacy of the liquidation proceedings must be judged by the remedies available for Panama's remaining fraud-based claims against the BCCI defendants.

The BCCI defendants have presented sufficient proof to demonstrate that the remedies available under these claims are not "so clearly inadequate or unsatisfactory that [they are] no remed[ies] at all." *See Piper Aircraft*, 454 U.S. at 255, 102 S.Ct. at 265. Three court-appointed liquidators testified that claims for damages such as Panama's claims for fraud, conversion, and breach of fiduciary duty can be asserted in the liquidation proceedings. Claims for damages, along with claims for pre-established debt, may be submitted in the liquidation proceedings with "acceptable evidence of debt." If the claim is rejected, the dissatisfied claimant may appeal to the court of appropriate jurisdiction in the country where the liquidation is proceeding.

Panama has presented no evidence to rebut the court appointed liquidators' representations that Panama's claims for damages against the BCCI defendants may be asserted in any of the three liquidation proceedings. Because the liquidation proceedings provide Panama with a remedy for its fraud-based claims against the BCCI defendants, they are not "clearly inadequate or unsatisfactory."[28]

---

[28]The fact that the liquidation proceedings institute pooling agreements by which BCCI's assets are divided ratably among creditors does not affect the adequacy of the fora. Because no BCCI assets are located in this country, any judgment obtained by Panama here would have to be enforced in the liquidation proceedings. Therefore, wherever the judgment is obtained, Panama's recovery will be limited by the pooling agreements.

*2. Balancing of Private and Public Factors*

Having determined that the liquidation proceedings are available and adequate, we conclude that the district court carefully considered the relevant public and private factors and did not abuse its discretion in finding that these factors weighed in favor of dismissal. Relevant private factors include the relative ease of access to sources of proof, ability to obtain witnesses, and "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843; *La Seguridad v. Transytur Line,* 707 F.2d 1304, 1307 (11th Cir.1983). We begin our review of the private factors by noting that a foreign plaintiff's choice of forum deserves less deference. *Piper Aircraft*, 454 U.S. at 255, 102 S.Ct. at 266 ("When the home forum has been chosen, it is reasonable to assume that this choice is convenient. When the plaintiff is foreign, however, this assumption is much less reasonable.").

We find adequate support in the record for the district court's conclusion that private factors weigh in favor of dismissal. Panama alleges that the defendants participated in an international banking scheme to defraud Panama of funds rightfully belonging to it. The vast majority of the fraudulent acts committed in furtherance of this scheme were committed abroad. As a result, documents and witnesses necessary to prove or disprove the validity of Panama's allegations are scattered throughout the world. *See BCCI Holdings v. Mahfouz,* 828 F.Supp. 92, 97 (D.D.C.1993) (dismissing action because, *inter alia,* "the large majority of the material acts of fraud mentioned in the complaint are alleged to have occurred abroad"). It was therefore not unreasonable to conclude that England or Luxembourg, where more of the allegedly fraudulent acts occurred, would be a more convenient location to resolve this dispute.

In addition, considerations of efficiency and cost strongly favor dismissal. The district court properly considered "the enforceability of a judgment" obtained from a United States court. *See Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843. Because the BCCI defendants have no remaining assets in this country, Panama would have to proceed in one of the court-ordered liquidation proceedings

in order to enforce any judgment obtained in this country.[29]  Therefore, it would be more efficient and less costly to resolve this dispute in one of the three jurisdictions where the BCCI court-appointed liquidators are already conducting proceedings and where a judgment would have to be enforced regardless of where liability is determined.

Similarly, we conclude that the public interest factors support the district court's decision to dismiss this case.  Relevant public interest factors include the sovereigns' interests in deciding the dispute, the administrative burdens posed by trial, and the need to apply foreign law.  *Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843;  *La Seguridad,* 707 F.2d at 1307.  The Cayman Islands, England, and Luxembourg have strong interests in implementing the ongoing liquidation proceedings and in regulating the BCCI banking entities, which were incorporated in these countries.  *See Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 1002 (2d Cir.) (noting strong local interest in foreign liquidation proceedings), *cert. denied,* 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993).  In contrast, the primary interest of the United States in this dispute has been substantially vindicated by the criminal RICO prosecution of the BCCI defendants in the District of Columbia.

Because any judgment obtained by Panama will have to be enforced in the foreign liquidation proceedings, there appears to be little reason to submit United States courts and jurors to the burdens of litigating this dispute.[30]  *See Allstate,* 994 F.2d at 1001 (noting that district court properly considered fact that judgments would have to be enforced in foreign bankruptcy proceedings).  Finally, the district court properly considered that it would have to apply Panamanian law in resolving this dispute.  In sum, we find no error in the district court's conclusion that the relevant private and public factors weigh in favor of dismissal.[31]

---

[29]We give very little weight to Panama's contention that a judgment could be enforceable in this country because BCCI funds may be "unearthed after the liquidation proceedings wind up."

[30]In objecting to BCCI's criminal plea agreement, Panama argued that "[t]he removal of assets from our [sic] shores would make the continuation of U.S. litigation practically pointless." Panama's Memorandum of Law in Support of its Motion for Restitution at 2, *United States v. BCCI Holdings,* (Cr.91-0655(JHG)).

[31]Panama contends, for the first time on appeal, that the district court erred by not conditioning the dismissal of this action upon a determination that the liquidators would exercise jurisdiction over its claims.  Because Panama had ample opportunity to raise this issue before the

## III. Conclusion

Accordingly, the district court's order dismissing Panama's claims against the First American defendants for lack of personal jurisdiction is REVERSED. We nevertheless AFFIRM the dismissal of these claims because Panama failed to state a RICO claim against these defendants. We also AFFIRM the district court's order dismissing Panama's claims against the BCCI defendants.

---

district court and failed to do so, we refuse to address it at this stage of the proceedings. *See Narey,* 32 F.3d at 1526-27.